J. W. BATESON CO., INC., ET AL. v. UNITED STATES
EX REL. BOARD OF TRUSTEES OF THE NATIONAL
AUTOMATIC SPRINKLER INDUSTRY
PENSION FUND ET AL.

No. 76–1476.   Argued November 30, 1977—Decided February 22, 1978

*Jack Rephan* argued the cause and filed briefs for petitioners.

*Donald J. Capuano* argued the cause for respondent. With him on the brief was *Patrick C. O'Donoghue.\**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Under the Miller Act, 49 Stat. 793, as amended, 80 Stat. 1139, 40 U. S. C. § 270a *et seq.*, a prime contractor on a federal construction project involving over $2,000 must post a payment bond to protect those who have a direct contractual relationship with either the prime contractor or a "subcontractor." The issue in this case is whether the term "subcontractor," as used in the Act, encompasses a firm that is technically a "sub-subcontractor."

The material facts are not in dispute. Petitioner J. W. Bateson Co. entered into a contract with the United States for construction of an addition to a hospital and provided a payment bond signed by Bateson's president and by representatives of petitioner sureties. Bateson, the prime contractor, subcontracted with Pierce Associates for a portion of the original work, and Pierce in turn subcontracted with Colquitt Sprinkler Co. for the installation of a sprinkler system, one of the items specified in the contract between Bateson and the United States. Under a collective-bargaining agreement with respondent Road Sprinkler Fitters Local Union No. 669, Colquitt was obligated to pay over amounts withheld from employees' wages for union dues and vacation savings, and to contribute to the union's welfare, pension, and educational trust funds. When Colquitt failed to make any of these pay-

---

*Briefs of *amici curiae* urging reversal were filed by *Kahl K. Spriggs* for the Associated General Contractors of America; and by *James V. Dolan* for the Surety Association of America et al.

ments by the end of the union members' employment with the firm, the union and respondent trustees notified Bateson of the amount that they claimed was due them under the payment bond and then filed suit against Bateson in the name of the United States.

The District Court granted summary judgment for respondents, and the Court of Appeals for the District of Columbia Circuit affirmed, 179 U. S. App. D. C. 325, 551 F. 2d 1284 (1977). The appellate court recognized that Colquitt, which had a contractual relationship with Pierce but not with Bateson, was "technically a sub-subcontractor," but it concluded nevertheless that Colquitt should be considered a "subcontractor" for purposes of payment bond recovery by its employees or their representatives. *Id.*, at 327, 551 F. 2d, at 1286.[1] Applying a functional test based on the "substantial[ity] and importan[ce]" of the relationship between Bateson and Colquitt, the court noted that Colquitt was performing on the jobsite "an integral and significant part of [Bateson's] contract" with the Government, that the work "was performed over a substantial period of time," that Bateson had access to Colquitt's payroll records, and that Bateson could have protected itself "through bond or otherwise" against Colquitt's default. *Ibid.*, 551 F. 2d, at 1286.

We granted certiorari, 433 U. S. 907 (1977), to resolve a conflict between the decision below and the holdings of at least three other Circuits.[2] We now reverse.

---

[1] The right of trustees of union trust funds to assert a claim against a Miller Act payment bond on behalf of employees was established in *United States ex rel. Sherman* v. *Carter,* 353 U. S. 210, 218–220 (1957). That case also held that amounts which the employer agreed to contribute to union trust funds could be recovered by the employees or their representatives under the payment bond. See *id.,* at 217–218.

[2] *United States ex rel. Powers Regulator Co.* v. *Hartford Accident & Indemnity Co.,* 376 F. 2d 811 (CA1 1967); *United States ex rel. W. J. Halloran Steel Erection Co.* v. *Frederick Raff Co.,* 271 F. 2d 415 (CA1 1959); *Fidelity & Deposit Co.* v. *Harris,* 360 F. 2d 402, 407–409 (CA9

Like the predecessor Heard Act, Act of Aug. 13, 1894, ch. 280, 28 Stat. 278, as amended, Act of Feb. 24, 1905, 33 Stat. 811, the Miller Act was designed to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects. *F. D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U. S. 116, 122 (1974). Because "a lien cannot attach to Government property," persons supplying labor or materials on a federal construction project were to be protected by a payment bond. *Id.,* at 121–122. The scope of the Miller Act's protection is limited, however, by a proviso in § 2 (a) of the Act that "had no counterpart in the Heard Act." *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.,* 322 U. S. 102, 107 (1944). This proviso has the effect of requiring that persons who lack a "contractual relationship express or implied with the [prime] contractor" show a "direct contractual relationship with a subcontractor" in order to recover on the bond. 40 U. S. C. § 270b (a); [3] see *F. D. Rich Co. v. United States ex rel.*

_____

1966); *Elmer v. United States Fidelity & Guaranty Co.,* 275 F. 2d 89 (CA5), cert. denied, 363 U. S. 843 (1960). See also *United States ex rel. DuKane Corp. v. United States Fidelity & Guaranty Co.,* 422 F. 2d 597, 599–600, and n. 4 (CA4 1970).

[3] Section 2 (a) of the Miller Act, as set forth in 40 U. S. C. § 270b (a), provides in full:

"Every person who has furnished labor or material in the prosecution of the work provided for in [the] contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: *Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such

*Industrial Lumber Co., supra,* at 122; *Clifford F. MacEvoy Co.* v. *United States ex rel. Calvin Tomkins Co., supra,* at 107–108. In the instant case it is conceded that Colquitt's employees enjoyed no contractual relationship, "express or implied," with Bateson, and that they did have a "direct contractual relationship" with Colquitt. The question before us, then, is whether Colquitt can be considered a "subcontractor."

As we observed in *Clifford F. MacEvoy Co.* v. *United States ex rel. Calvin Tomkins Co., supra,* Congress used the word "subcontractor" in the Miller Act in accordance with "usage in the building trades." 322 U. S., at 108–109; see *id.,* at 110. In the building trades,

> "a subcontractor is one who *performs for and takes from the prime contractor* a specific part of the labor or material requirements of the original contract . . . ." *Id.,* at 109 (emphasis added).

It thus appears that a contract with a prime contractor is a prerequisite to being a "subcontractor."[4]

---

person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Such notice shall be served by mailing the same by registered mail, postage prepaid, in an envelop[e] addressed to the contractor at any place he maintains an office or conducts his business, or his residence, or in any manner in which the United States marshal of the district in which the public improvement is situated is authorized by law to serve summons."

[4] The structure of the § 2 (a) proviso as it relates to notice lends further support to this view. Under the proviso, those having a claim against a "subcontractor" must give written notice to the prime contractor within 90 days of completing work on the job in order to recover against the payment bond. 40 U. S. C. § 270b (a); see n. 3, *supra.* This requirement "permits the prime contractor, after waiting ninety days, safely to pay his subcontractors without fear of additional liability to subsubcontractors or materialmen." *United States ex rel. Munroe-Lang-Stroth, Inc.* v. *Praught,* 270 F. 2d 235, 238 (CA1 1959). The notice provision thus prevents both "double payments" by prime contractors and

This interpretation of the Act's language is confirmed by the legislative history, which leaves no room for doubt about Congress' intent. While relatively brief, the authoritative Committee Reports of both the House of Representatives and the Senate squarely focus on the question at issue here:

> "A sub-subcontractor may avail himself of the protection of the bond by giving written notice to the contractor, but that is as far as the bill goes. It is not felt that more remote relationships ought to come within the purview of the bond." H. R. Rep. No. 1263, 74th Cong., 1st Sess., 3 (1935); S. Rep. No. 1238, 74th Cong., 1st Sess., 2 (1935).

This passage indicates both that Congress understood the difference between "sub-subcontractors" like Colquitt and "subcontractors" like Pierce, and that it intended the scope of protection of a payment bond to extend no further than to sub-subcontractors. See *MacEvoy,* 322 U. S., at 107–108, and n. 5. There is nothing to the contrary anywhere in the legislative history. Thus, while Colquitt could have claimed

---

the alternative of "interminable delay in settlements between contractors and subcontractors." *United States ex rel. J. A. Edwards & Co.* v. *Thompson Construction Corp.,* 273 F. 2d 873, 875–876 (CA2 1959), cert. denied, 362 U. S. 951 (1960).

If the term "subcontractor" in the proviso had been meant to include sub-subcontractors like Colquitt, it seems likely that notice would have been required, not only to the prime contractor, but also to intermediate subcontractors like Pierce. The prime contractor or his surety, while having initial responsibility for payment of the claimant, would probably in turn either withhold that amount from, or file a claim against, a bond or indemnity furnished by, the intermediate subcontractor. (Here, for example, it appears that Pierce had agreed to indemnify Bateson against such losses. Brief for Petitioners 18 n. 15.) Hence notice to the intermediate subcontractor would serve the same purpose as does notice to the prime contractor: prevention of double payments (*e. g.,* Pierce making full payment to Colquitt, then having to indemnify Bateson for amounts owed by Colquitt to its employees) or delayed settlements.

against the payment bond had Pierce defaulted in its obligations, the employees of Colquitt were not similarly protected against Colquitt's default, because they did not have a contractual relationship with Pierce or any other "subcontractor." [5]

This view of what was intended in the Miller Act is reinforced by the fact that all reported decisions that have considered the question, except that of the court below and one early District Court decision, have reached the same conclusion.[6] Presumably aware of this well-settled body of law

---

[5] We note that Colquitt's employees also would not have been protected under the mechanic's lien statutes of many States. See *supra,* at 589. While these statutes have always varied widely, it appears that a large number of States, including some of the most commercially significant States, have restricted mechanics' liens to persons dealing directly with the prime contractor or with a subcontractor who dealt with the prime contractor. See, *e. g., Battista* v. *Horton, Myers & Raymond,* 76 U. S. App. D. C. 1, 3, 128 F. 2d 29, 31 (1942) (District of Columbia mechanic's lien statute); *Wynkoop* v. *People,* 1 App. Div. 2d 620, 153 N. Y. S. 2d 836 (1956), summarily aff'd, 4 N. Y. 2d 892, 150 N. E. 2d 771 (1958) (New York statute restricting mechanics' liens to those "performing labor for or furnishing materials to a contractor [or] his subcontractor"). See generally Note, Mechanics' Liens and Surety Bonds in the Building Trades, 68 Yale L. J. 138, 147–148 (1958).

[6] See cases cited in n. 2, *supra; Aetna Ins. Co.* v. *Southern, Waldrip & Harvick,* 198 F. Supp. 505 (ND Cal. 1961); *United States ex rel. Whitmore Oxygen Co.* v. *Idaho Crane & Rigging Co.,* 193 F. Supp. 802 (Idaho 1961); *United States ex rel. Jonathan Handy Co.* v. *Deschenes Construction Co.,* 188 F. Supp. 270 (Mass. 1960); *United States ex rel. Newport News Shipbuilding & Dry Dock Co.* v. *Blount Bros. Construction Co.,* 168 F. Supp. 407 (Md. 1958). Contra, *McGregor Architectural Iron Co.* v. *Merritt-Chapman & Scott Corp.,* 150 F. Supp. 323 (MD Pa. 1957). See also H. Cohen, Public Construction Contracts and the Law § 7.9, p. 208 (1961); 8 J. McBride & I. Wachtel, Government Contracts § 49.320 [2] (1977); R. Shealey, Law of Government Contracts § 143A, p. 187 (3d ed. 1938); Forster & DeBenedictis, Construction Contracts in Government Contracts Practice § 14.13, pp. 683–684 (1964); Stickells, Bonds of Contractors on Federal Public Works: The Miller Act, 36 B. U. L. Rev. 499, 512–516 (1956); Note, *supra,* n. 5, at 164.

dating back almost 20 years, Congress has never moved to modify the Act's coverage. As a result, all of those concerned with Government projects—prime contractors, sureties, various levels of subcontractors and their employees—have been led to assume that the employees of a sub-subcontractor would not be protected by the Miller Act payment bond and to order their affairs accordingly.[7] In the absence of some clear indication to the contrary, we should not defeat these reasonable expectations, particularly in view of the importance of certainty with regard to bonding practices on Government construction projects. See generally *MacEvoy, supra*, at 110–111.

In reaching a result contrary to that of other Courts of Appeals, the court below did not address itself either to the legislative history quoted above or to the conflict among the Circuits that its ruling created. Instead, it focused primarily on the substantiality and importance of the relationship between Colquitt and Bateson, see *supra*, at 588, relying for this approach on our decisions in *MacEvoy* and *F. D. Rich Co. v. United States ex rel. Industrial Lumber Co.* While those cases did involve the scope of the term "subcontractor" in the § 2 (a) proviso, they arose in situations in which the

---

[7] In the instant case, it appears that all of the affected parties arranged their affairs on the assumption that Colquitt's employees would not be covered by the payment bond. Bateson required an indemnity agreement from Pierce, Brief for Petitioners 18 n. 15, doubtless in part to protect Bateson from claims against the payment bond made by those contracting with Pierce. But Pierce did not require a similar agreement from Colquitt, *ibid.*, presumably because Pierce did not think that Colquitt's employees, on Colquitt's default, would have recourse against Bateson's payment bond. Finally, the agreement between Colquitt and the union contained a provision, which the union ultimately chose not to enforce, requiring Colquitt to post a bond to guarantee the various payments that it was required to make to the union and its trust funds. App. 13; see *id.*, at 49 (affidavit of union trustee).

firm at issue, unlike Colquitt, had a direct contractual relationship with the prime contractor. The question in both cases was whether a supplier of materials to the prime contractor could be considered a "subcontractor," [8] and on this question an absence of dispositive statutory language and legislative history led the Court ultimately to look to "functional" considerations. 417 U. S., at 123–124; see 322 U. S., at 110–111. In the instant case, by contrast, the traditional tools of statutory construction provide a definitive answer to the question before us, and hence it would be inappropriate to utilize the approach relied on by the Court of Appeals.

In concluding that the word "subcontractor" must be limited in meaning to one who contracts with a prime contractor, we are not unmindful of our obligation to construe the "highly remedial" Miller Act "liberal[ly] . . . in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *MacEvoy, supra,* at 107. As we wrote in *MacEvoy,* however, "such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds. . . . [W]e cannot disregard the limitations on liability which Congress intended to impose and did impose in the proviso of § 2 (a)." 322 U. S., at 107. It was Congress that drew a line between sub-subcontractors and those in "more remote relationships" to the prime contractor. H. R. Rep. No. 1263, *supra,* at 3; S. Rep. No. 1238, *supra,* at 2; *MacEvoy, supra,* at 108; *Rich,* 417 U. S., at 122. If the scope of protection afforded by a Miller Act payment bond is to be extended, it is Congress that must make the change.

---

[8] In *MacEvoy* we held that a firm which had merely supplied materials to the prime contractor could not be considered a "subcontractor." In *Rich* we concluded that a firm which had contracted with the prime contractor both to install certain items in a housing project and to supply materials for the project was a "subcontractor."

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court's narrow reading of the word "subcontractor" creates a system of protection for construction workers that I cannot believe Congress intended. It drives a wedge between employees working side by side on tasks equally vital to "the prosecution of the work." 40 U. S. C. § 270a (a) (2). Under the Court's reading, those who work for the general contractor or for a "first-tier" subcontractor are protected by the bond; those who work for other subcontractors are unprotected.

The Court's construction of the statute derives strong support from the statement in the Committee Reports distinguishing between "sub-subcontractors" and "more remote relationships." Nevertheless, I am persuaded that contrary evidence of congressional intent outweighs the isolated statement upon which the Court's decision primarily rests. I shall therefore first explain why I think the Act protects every person who has supplied labor or material in the prosecution of the work provided for in the prime contract. Thereafter, I shall explain why I believe the excerpt from the Committee Reports does not compel a contrary conclusion.

I

The Miller Act, like the Heard Act which preceded it, covers "all persons supplying labor and material in the prosecution of the work provided for in [a federal construction] contract." [1]

---

[1] 40 U. S. C. § 270a (a) (2). Almost identical language in the Heard Act covered "all persons supplying [a contractor or contractors] labor

Unless this language were to be narrowly read to cover only persons supplying labor or materials directly to the general contractor—and no one suggests that such a narrow reading is proper—it plainly identifies "the prosecution of the work" as the proper test of coverage. This Court so read the comparable language in the Heard Act in *United States ex rel. Hill* v. *American Surety Co.*, 200 U. S. 197.

In that case the Court recognized that a "liberal interpretation" was needed to further "the manifest purpose of the statute to require that material and labor actually contributed to the construction of the public building shall be paid for and to provide a security to that end." *Id.*, at 203.[2] The *Hill* Court therefore allowed recovery to all who supplied labor

and materials in the prosecution of the work provided for in [a federal construction] contract." Act of Aug. 13, 1894, ch. 280, 28 Stat. 278, as amended, 40 U. S. C. § 270 (1926 ed.).

[2] The purpose of the Act had been explained in the House Report:

"Your committee has fully considered the above bill, and find that there is no law now in existence for the protection of mechanics and material-men in this class of cases, as it is contrary to allow mechanics' or material-men's liens on public buildings or public works, and in many cases person or persons entering into contracts with the United States for the building of public buildings are wholly insolvent at the time or at the completion of such work, and thereby persons furnishing material or labor are without remedy.

"In all such cases the United States requires the usual penal bond from the contractor or contractors of public buildings or works with good and sufficient security for the protection of the Government, and it seems to the committee that it is nothing more than just that the persons furnishing material or labor for the construction of such work should also be protected in the premises, and that there should be an additional obligation in all such bonds to the effect that the persons furnishing material and labor for the construction of public building or work should have the right to bring suit on said bond . . . ." H. R. Rep. No. 97, 53d Cong., 1st Sess., 1 (1893).

This excerpt is significant, not only because it explains the origin of the legislation, but also because the first sentence illustrates the care with which committee reports are sometimes edited. Cf. n. 16, *infra*.

to the contractor, whether directly or indirectly through a subcontractor.[3]

The question at the heart of this case is whether Congress intended the Miller Act to cut back the coverage of the Heard Act. The fact that there was no significant change in the statutory language identifying the persons protected by the Act is a sufficient reason for concluding that no change in coverage was intended.[4] This conclusion is confirmed by a study of the entire legislative history of the Miller Act.

The Miller Act was primarily designed to speed workmen's recoveries under the Heard Act by correcting procedural flaws in the old Act. Not a word in the legislative history hinted that the coverage of the Heard Act was too broad. To the contrary, the proposed revision was consistently presented as

---

[3] "In considering the statute and determining the scope of the bond divergent views have been urged upon the court. Upon the one hand it is insisted that the bond is to be strictly construed and a recovery limited to those who have furnished material or labor directly to the contractor, and upon the other that a more liberal construction be given and a recovery permitted to those who have furnished labor and materials which have been used in the prosecution of the work, whether furnished under the contract directly to the contractor, or to a subcontractor.

.        .        .        .        .

"The courts of this country have generally given to statutes intending to secure to those furnishing labor and supplies for the construction of buildings a liberal interpretation, with a view of effecting their purpose to require payment to those who have contributed by their labor or material to the erection of buildings to be owned and enjoyed by those who profit by the contribution of such labor or materials. . . .

.        .        .        .        .

"Looking to the terms of this statute in its original form, and as amended in 1905, we find the same Congressional purpose to require payment for material and labor which have been furnished for the construction of public works." 200 U. S., at 202–204.

[4] In general, the principles that governed the Heard Act also control the Miller Act. See *Fleisher Eng. & Constr. Co.* v. *United States ex rel. Hallenbeck,* 311 U. S. 15, 18.

598

a measure to strengthen the existing rights of laborers on public works.[5] "The most radical changes made in the existing law by these bills," Congressman Miller, the proponent of the Act, explained, "is that we provide in this bill for two bonds; one a performance bond to the Government, and the other a payment bond." [6]

While Congress intended to speed the recoveries of protected workers, it sought to do so within the framework of existing law. Witnesses testifying in support of the Act urged Congress to preserve as much language from the Heard Act as possible, in order that past judicial interpretations would continue to apply under the new Act.[7] Congressman Miller

---

[5] "The purpose sought to be accomplished" by the Act was stated by the Treasury Department, and the statement was adopted by the House Report:

"The major purpose of the bill seems to be to afford greater protection to subcontractors, laborers, and materialmen by shortening the period within which action may be instituted by them against the surety. With this purpose the Treasury Department is fully in accord, as there have been many instances in which several years have elapsed after the performance of the work before a judicial remedy was available under the existing law." H. R. Rep. No. 1263, 74th Cong., 1st Sess., 1–2 (1935) (quoting a letter from the Treasury Department).

An identical passage appears in the Senate Report, which merely reprints the House Report. S. Rep. No. 1238, 74th Cong., 1st Sess., 1 (1935). Because there are no substantial differences between them, I shall refer only to the House Report.

[6] Hearings on Bonds of Contractors on Public Works before the House Committee on the Judiciary, 74th Cong., 1st Sess., 67 (1935).

[7] One witness told the Committee:

"The Heard Act has been on the statute books since 1905. Its predecessor had been in effect since August 1894. Now, in that forty-odd years the surety companies and the public generally have spent hundreds of thousands of dollars in finding out just what that act means. As I say, it has been called to the attention of courts hundreds of times and the decisions rendered have cost us lots of money and I do not think there is any other statute on the books that has been so thoroughly analyzed and

himself noted that the Committee was "rather loath to disturb existing law and existing court decisions where we can correct the difficulty without doing so." [8]    Thus it is especially significant that the drafters lifted bodily from the Heard Act the coverage provision that had already been construed in *Hill*.

The historical context in which the statute was enacted confirms this analysis.  The Miller Act was passed during the depression of the 1930's.  Few construction laborers could then find work except on Government projects.  Reform of the Heard Act drew urgency from the ironic discovery that precious construction jobs too often proved worthless when an irresponsible subcontractor was unable to pay his workers.  An exchange between Senators Walsh and McCarran about the Miller Act shows the sentiments of the day:

> "Mr. WALSH.  Mr. President, . . . the investigation conducted by the subcommittee of the Committee on Education and Labor showed a deplorable condition with reference to the way employees on public buildings were defrauded and cheated of their wages, and any measure that will tend to strengthen their rights and help them to secure their compensation is justified.
>
> "Mr. McCARRAN.  That is the object of the pending bill . . . ."  79 Cong. Rec. 13383 (1935).

The language of the Miller Act is entirely consistent with the obvious legislative intent to preserve the substantive protections of the Heard Act.  The Miller Act extends coverage

---

construed.  You might say every clause or every word has been examined by some court, some place, some time.  We all know it and it is unusual now for any controversy to arise over the fundamental part of the law. The only controversy in the Heard Act suit is whether the claimant has a good claim or whether he has not." *Id.*, at 49–50.
Another witness concurred in this statement. *Id.*, at 59.

[8] *Id.*, at 102.  Congressman Miller went on to state that he would have preferred simply to amend the Heard Act, but that he was eventually persuaded that a more thorough revision was necessary. *Ibid.*

to "all persons supplying labor and material in the prosecution of the work provided for in [the] contract . . . ."[9] This coverage is comparable to that afforded by many state mechanic's lien statutes. See generally Note, Mechanics' Liens and Surety Bonds in the Building Trades, 68 Yale L. J. 138 (1958). The purpose of both the Heard Act and the Miller Act was to protect persons supplying labor or materials for federal construction projects, which are not subject to state mechanics' liens.[10] Giving an ordinary meaning to the language used by both Acts will achieve that purpose.

The proviso to § 2 (a) of the Miller Act, which requires persons having a direct relationship with a subcontractor to give written notice of his claim to the prime contractor, does not narrow the coverage of the statute. It merely requires persons covered by the bond to give the required notice in order to preserve their protection.[11]

---

[9] 40 U. S. C. § 270a (a) (2). Cf. *United States ex rel. Hill* v. *American Surety Co.*, 200 U. S. 197, 204:

"[A]ll persons supplying the contractor with labor or materials in the prosecution of the work provided for in the contract are to be protected. The source of the labor or material is not indicated or circumscribed. It is only required to be 'supplied' to the contractor in the prosecution of the work provided for. How supplied is not stated, and could only be known as the work advanced and the labor and material are furnished.

"If a construction is given to the bond so limiting the obligation incurred as to permit only those to recover who have contracted directly with the principal, it may happen that the material and labor which have contributed to the structure will not be paid for, owing to the default of subcontractors and the manifest purpose of the statute to require compensation to those who have supplied such labor or material will be defeated."

[10] "As against the United States, no lien can be provided upon its public buildings or grounds, and it was the purpose of this act to substitute the obligation of a bond for the security which might otherwise be obtained by attaching a lien to the property of an individual." *Id.*, at 203.

[11] The proviso states:

"*Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or

It is true, of course, that it would be anomalous to require that notice be given by employees of first-tier subcontractors but not by employees of second-tier subcontractors.[12]  *Clifford F. MacEvoy Co.* v. *United States ex rel. Calvin Tomkins Co.,* 322 U. S. 102, 108.   But that anomaly is entirely avoided if the term "subcontractor" is read to refer to any person or firm that has contracted to do any part of the work provided for in the prime contract, whether that person has dealt directly with the prime contractor or with another subcontractor.   In the common usage of the construction trades, the term "subcontractor" does not include ordinary laborers or materialmen.  *Id.,* at 109.   But the term is often used to describe subordinate contractors who have accepted contractual responsibility for a portion of the work covered by the basic contract, no matter how many subcontractors lie between the general contractor and the subcontractor who actually does the work.[13]

---

implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made . . . ."   40 U. S. C. § 270b (a).

[12] Such an anomaly is produced by a narrow reading of the proviso to encompass only persons dealing with "first-tier" subcontractors.   Under the narrow reading, those dealing with first-tier subcontractors must give notice, while those dealing with second-tier subcontractors need not.   The Court avoids this anomaly by cutting back on the *coverage* provision.   Rather than letting the tail wag the dog, it is more sensible to read the notice provision broadly, to match the breadth of the coverage provision.

[13] The Court relies on a quotation from *Clifford F. MacEvoy Co.* v. *United States ex rel. Calvin Tomkins Co.,* 322 U. S. 102, declaring that "a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen."  *Id.,* at 109.   The Court italicizes the dictum and omits the holding.  *Ante,* at 590.   I agree with the holding; ordinary laborers and materialmen who do not deal with the prime contractor or a subcontractor do not supply labor or materials "in the prosecution of the work."   Cf. *MacEvoy, supra,* at 107 (leaving question open).   The dictum is unfortunately worded, but it does not

State courts, which have more occasion to deal with construction contracts than we do, recognize that a generic use of the term subcontractor is entirely proper. For example, Colorado's construction bond law protects persons furnishing labor or materials to a "contractor, or his subcontractor." Despite the personal pronoun, the Colorado Supreme Court has held that the bond covers those who deal with a "second-tier" subcontractor, saying:

> "To construe the term 'sub-contractor' so as to exclude a 'sub-subcontractor' from the protection granted by the contractor's bond statute would require us to ignore the purpose of the statute. Since the benefits of our mechanic's lien act do not apply to projects constructed by governmental agencies, a remedy similar to our mechanic's lien statute was provided by the legislature for the protection of those furnishing supplies or material for such projects. . . . The statute stands in lieu of the mechanic's lien statute, and is designed to protect those who supply labor and materials for public works." *South-Way Constr. Co.* v. *Adams City Serv.*, 169 Colo. 513, 516–517, 458 P. 2d 250, 251 (1969).

Other courts have taken a similar approach. See, *e. g., Nash Eng. Co.* v. *Marcy Realty Corp.*, 222 Ind. 396, 54 N. E. 2d 263 (1944); *Bumb* v. *Petersmith Controls, Inc.*, 377 F. 2d 817 (CA9 1967) (remote subcontractor is protected "subcontractor" under California law); *Hey Kiley Man, Inc.* v. *Azalea Gardens Apts.*, 333 So. 2d 48, 50–51 (Fla. App. 1976). See also Note, 45 Harv. L. Rev. 1236, 1238–1239 (1932) (using "subcontractor" generically in noting a trend favoring bond coverage for "remote subcontractors").

Thus, if we consider the language of the statute, its broad purpose to provide protection comparable to that afforded by

---

contradict my view. Utimately, a second-tier subcontractor who takes a portion of the contract takes it "from the prime contractor," although he takes it indirectly.

state mechanic's lien laws on private contracts, and its specific purpose to provide protection for laborers performing work on federal projects, we must conclude that employees of a "sub-subcontractor" who actually perform work on the job are protected.

## II

The contrary argument rests almost entirely [14] on a statement in the Committee Reports that draws a distinction

---

[14] It has been argued that Congress was unwilling to impose liability on sureties for a long chain of relationships. But this argument ignores the control that sureties and general contractors have over their subcontractors. They may refuse to deal with subcontractors who do not indemnify them against remote claims. They may even require a bond from each subcontractor. In fact, because the general contractor is liable, even under the Court's view, for claims against subcontractors in the first tier, indemnity agreements between general contractors and their subcontractors are common today. One was required in the present case. *Ante,* at 593 n. 7. My reading of the statute would simply lead cautious subcontractors to demand similar guarantees from their subcontractors.

There is no reason to fear that sureties' liability will grow beyond their control or their ability to estimate. The cost of the entire project provides a basis for estimating the aggregate contingent liability.

In addition, the Court suggests that the Miller Act would have required laborers to give notice to intermediate subcontractors as well as the general contractor if a more generous reading of the statute had been contemplated. *Ante,* at 590–591, n. 4. But the drafters were understandably worried that many unwary workers would forfeit their protection if complicated notice requirements were imposed. Indeed, the Treasury Department opposed *any* notice requirement for just this reason:

"[O]ver nine-tenths of your laborers and the material men doing business on a small scale that were not in constant touch with their lawyers would not know of the requirement, and they would wake up to find that their period had expired within which to give such notice, and they would be barred." Hearings, *supra* n. 6, at 99–100. See also *id.,* at 103, 30–31, and 36–37.

Requiring notice to the surety as well as to the general contractor would have protected sureties from deceitful general contractors, and a requirement of this nature was suggested to the Committee. *Id.,* at 63. The Committee rejected that suggestion. Forcing the laborer to notify several

between a "sub-subcontractor" and "more remote relation-
ships." [15]  I believe the significance of that statement has been
overemphasized.

Those who have participated in the making of legislative
history know that congressional reports sometimes contain
statements that are merely intended to summarize portions of
the hearings or to answer testimony expressing specific concerns
about a bill.  For this reason, the hearings should be examined
in order to understand the excerpt on which the Court
relies.  In three days of testimony, the coverage of the Act
was mentioned only briefly.  A witness for a surety company
raised the specter of remote materialmen seeking to recover as
"subcontractors," an idea Congressman Miller quickly rejected:

> "Colonel PROCTOR. . . .   [If] it will cover everybody
> all the way down the line *whether the work goes into the
> job or not* you have an insurance policy and not a surety.
> For example, if it will cover the labor of the quarryman
> that strips the quarry, that he is a subcontractor to the
> man that cuts the stone, that he is a subcontractor with
> the man that lays the stone and he is a subcontractor with
> the general contractor, you have a situation there that is
> an insurance policy and not a bond.

parties is an added burden that increases the danger of lost claims.  Con-
gress could have concluded that a single notice requirement was all that
should be imposed on workers and small businessmen.

As a practical matter, no prejudice is likely to flow from this omission.
If the bond is held to cover claims against remote subcontractors, proxi-
mate subcontractors will no doubt be required to indemnify the general
contractor.  In return for the indemnity, these subcontractors will no
doubt demand that the general contractor promptly transmit any statu-
tory notice he receives.

[15] "A sub-subcontractor may avail himself of the protection of the bond
by giving written notice to the contractor, but that is as far as the bill
goes.  It is not felt that more remote relationships ought to come within
the purview of the bond." H. R. Rep. No. 1263, 74th Cong., 1st Sess.,
3 (1935).

"Mr. MILLER. We are not figuring in going into all the subcontractors." Hearings, *supra* n. 6, at 61–62 (emphasis added).

This colloquy was concerned with the danger that the term "subcontractor" might be used loosely to describe the suppliers or employees of materialmen. It was that danger that I believe the Committee Report was intended to forestall. Obviously, suppliers or employees of materialmen do not provide "work [that] goes into the job." They are not considered "subcontractors" under the most common usage in the construction trades, as this Court recognized when it construed the Miller Act to bar the claims of remote materialmen and their employees. *Clifford F. MacEvoy Co.* v. *United States ex rel. Calvin Tomkins Co.*, 322 U. S. 102.

It is the "remote relationship" of persons like the quarryman and the stonecutter mentioned in the hearings that I believe the author of the Committee Report intended to exclude from the statute. Since the wording of the statute is itself adequate to effectuate this intent, there is no reason to give further effect to the unnecessarily broad language used by the author of the Committee Report to allay the narrow concern identified in the Committee hearings.[16] If Congress had intended to do more than allay that concern—if it had intended to cut back on the coverage of the Heard Act—I am convinced that it would have used *statutory* language to accomplish its purpose.[17]

---

[16] As is demonstrated by the legislative history of the Heard Act, see n. 2, *supra*, a committee report is not edited as carefully as the bill itself.

[17] Unlike the Court, I would not put great weight on the industry's longstanding "assumption" about the law. *Ante*, at 592–593, and n. 7. For many years after passage of the Miller Act, no court ratified this assumption, and the cases since the mid-1950's have been divided. The Court notes three Circuits that have supported the industry's view and one that has attacked it. *Ante*, at 588–589, n. 2. It finds a similar pattern among the District Courts: four in favor and one opposed. *Ante*, at 592

In sum, while I cannot unequivocally assert that my explanation of the statement in the Committee Report is correct, the apparent genesis of the statement casts sufficient doubt on its intended purpose to prevent it from overriding what I regard as compelling evidence of a contrary congressional intent.

I respectfully dissent.

---

n. 6   The preponderance of authority supports the industry, but the cases hardly justify a claim that the law was "well settled" or certain before today.   The fact that this case is before us argues to the contrary, for this Court seldom grants certiorari to decide "well-settled"questions.