ATTORNEYS FOR PLAINTIFF
J. Michael Cavosie
Ernest R. Rodabaugh, IV
Indianapolis, Indiana

ATTORNEYS FOR DEFENDANT
Kathleen A. Kilar
Michael D. Mustard
Fort Wayne, Indiana

ATTORNEYS FOR AMICUS CURIAE
THE SURETY & FIDELITY ASSOCIATION OF
AMERICA
Julia Blackwell Gelinas
Maggie L. Smith
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INDIANA CONSTRUCTION ASSOCIATION
Jon Laramore
Patrick M. Miller
Indianapolis, Indiana

---

# In the
# Indiana Supreme Court

---

### No. 94S00-0612-CQ-488

ALBERICI CONSTRUCTORS, INC.,
D/B/A HILLSDALE FABRICATORS,

*Plaintiff,*

v.

OHIO FARMERS INSURANCE COMPANY,

*Defendant.*

---

Certified Question from the United States District Court,
Northern District of Indiana, No. 1:06-CV-158
The Honorable William C. Lee, Judge

---

**May 22, 2007**

**Shepard, Chief Justice.**


The U.S. District Court for the Northern District of Indiana has certified to us a question
of Indiana law, pursuant to Indiana Appellate Rule 64:

Does a performance bond required by and issued in accordance with Ind. Code § 8-23-9-9 afford coverage to a third-tier claimant?

We now answer that Ind. Code § 8-23-9-9 does not afford coverage to claimants who do not have privity of contract with the general contractor or a subcontractor.

## Facts and Procedural History

On or about May 27, 2004, the Indiana Department of Transportation ("INDOT") awarded Primco, Inc. a construction contract for the reconstruction of an existing bridge and the erection of a pedestrian bridge near Bluffton, Indiana. On May 25, 2004, Primco secured a performance bond with defendant Ohio Farmers Insurance Company ("Farmers"). The performance bond follows INDOT contract requirements and the requirements of Ind. Code § 8-23-9-9, and the parties agree that the bond's protection does not extend to any party not otherwise envisioned by § 8-23-9-9.

On June 14, 2004, Primco issued a purchase order to Harmon Steel, Inc. for the provision of a pre-fabricated steel bridge to be used in the construction project. In turn, Harmon Steel issued a purchase order on June 18, 2004 to Gateway Bridge, LLC for a "pre-engineered, pre-fabricated steel truss pedestrian bridge, shipped in two pieces." (Stip. Facts ¶ 5.) Then on February 21, 2005, Gateway Bridge issued a purchase order for the fabrication of the bridge to "Hillsdale Fabricators," whose actual corporate name is Alberici Constructors, Inc.

Alberici fabricated and delivered the bridge pieces to Gateway Bridge, which has failed to pay Alberici. Alberici filed its bond claim with Farmers by letter dated October 31, 2005. Farmers denied the claim by letter dated January 13, 2006, explaining its position that Alberici "is too removed to have standing to bring claim." (Stip. Facts ¶ 13.)

Alberici sued Farmers in the U.S. District Court for the Northern District of Indiana. The parties filed cross-motions for summary judgment. Alberici asserts that the statute reflects an intent to allow parties situated similarly to Alberici to recover under the performance bond.

2

(Pl.'s Br. in Supp. of Summ. J. at 10-16.)  Alberici asks us to reject a tier-based approach to this issue and to adopt the functional coverage test laid out by the Court of Appeals in Title Guaranty & Surety Co. of Scranton, Pennsylvania v. State ex rel. Leavenworth State Bank, 61 Ind. App. 268, 109 N.E. 237 (1915).

Farmers and amici curiae Indiana Construction Association and Surety & Fidelity Association of America contend that Alberici's claim is too remote to be covered by the performance bond.  They argue that statutory construction, INDOT regulations, federal caselaw, and sound public policy support their contention.

**Section 8-23-9-9 Does Not Afford Coverage Beyond the Second Tier**

The Indiana Code requires the general contractor on a state highway contract to obtain a performance bond as surety for the project.  Ind. Code Ann. §§ 8-23-9-8 through -12 (West 2007).  Section 8-23-9-9 provides, among other things, that the bond must be "conditioned . . . upon the payment by the contractor and by all subcontractors for all labor performed or materials furnished or other services rendered in the construction of the highway."  Similarly, although not the focus of this certified question, § 8-23-9-12 directs a specific form and substance for such performance bonds:  "[The principal] shall promptly pay all debts incurred by the principal or any subcontractor in the construction of the work, including labor, service, and materials furnished."  Ind. Code Ann. § 8-23-9-12 (West 2001).[1]

We conclude that these provisions contemplate that the contractor and subcontractors must pay their debts related to a state highway project, and if they do not, the performance bond must provide coverage to protect laborers, material suppliers, and other service providers.  At a minimum, the provisions seem to protect all entities who share privity of contract with either the contractor or any subcontractor.

---

[1] The legislature made immaterial changes to § 8-23-9-12 in 2005.  2005 Ind. Acts 992-93.  Moreover, Primco secured the performance bond prior to the 2005 changes.

The definitions of "contractor" and "subcontractor" are central to this statutory regime, yet neither term is defined by the statute. The "contractor," also called a "general contractor" or "prime contractor," is commonly the person or organization "who contracts for the completion of an entire project," in this case with the state government. Black's Law Dictionary 351 (8th ed. 2004). The parties agree that Primco is the contractor.

"Subcontractor" is defined a bit more ambiguously. Interpreted broadly, "subcontractor" might mean any person or organization that has contracted, at any level, to provide any part of the labor or materials for the project, no matter how insignificant. This broad view of "subcontractor" includes what have been traditionally understood as "laborers" (those who supply only labor) and "materialmen" (those who supply only materials). But read more narrowly, "subcontractor" may be limited to those within one or a few degrees of contractual separation from the contractor and who are delegated a specific part of the contractual performance requirements. This narrower definition frequently excludes "laborers" and "materialmen."

The difference between these two viewpoints is crucial to determining the extent of the contractor's and the surety's responsibility for protecting laborers, material suppliers, and other service providers. As it is our objective in statutory construction "to determine and implement the intent of the legislature," we turn to other sources for guidance. Superior Const. Co. v. Carr, 564 N.E.2d 281, 284 (Ind. 1990).

*A. Other Sections of the Indiana Code.* When interpreting a statute, we presume the legislature intended to apply harmoniously Indiana Code sections with a similar purpose and subject matter. Schrenker v. Clifford, 270 Ind. 525, 387 N.E.2d 59 (1979).

There are other Code sections governing surety bonds and state construction projects, all of which share a similar purpose: to financially protect subcontractors, laborers, and material suppliers. See, e.g., Ind. Code Ann. §§ 4-13.6-7-6 (state public works projects); 5-16-5-2 (other state agencies' projects); and 5-16-5.5-4 (state projects over $100,000) (West 2007). In some of these sections, but not all, the bond provisions seem cut from the same cloth as § 8-23-9-9.

4

Of these, the Title 4 provision defines "subcontractor" in a way that suggests it covers only persons in privity with the prime contractor. Specifically, Title 4 defines "subcontractor" as "any person entering into a contract with a contractor to furnish labor or labor and materials used in the actual construction of a public works project," excluding the labor used in delivering materials to a project site. Ind. Code Ann. § 4-13.6-1-18 (West 2007). Chapter 5-16-5, in contrast, has no "subcontractor" definition for us to examine.

The bond provisions in chapter 5-16-5.5 contain a definition of "subcontractor,"[2] but these provisions seem less helpful to our task for two reasons. First, chapter 5-16-5.5 confines its definitions to it alone. See Ind. Code Ann. § 5-16-5.5-1 (West 2007). Second, chapter 5-16-5.5's bond provision is rather different than those found in Title 4, ch. 5-16-5, or § 8-23-9-9, diminishing its value in our analysis. The latter three are similar general requirements about the need to post bonds. By contrast, chapter 5-16-5.5 is a relatively brief enactment focused on retainage and incremental bonding.

Thus, to the extent the words of various statutes offer evidence about the definition of "subcontractor," Title 4 presents the closest thing we have to a respectable clue.

*B. INDOT Regulations.* The INDOT regulations on state construction bonds also guide us in defining "subcontractor." The understanding of an agency charged with implementing a given statute, while hardly binding, is entitled to fair weight in the courts.

Under the rules for prequalification of contractors and bidding on state highway contracts, a "subcontractor" is defined as "an individual, partnership, firm, corporation, or

---

[2] "Subcontractor" means:

> [A]ny person, firm, limited liability company, or corporation who is a party to a contract with the contractor and who furnishes and performs on-site labor on any public building, work or improvement. It also shall include materialmen who supply contractors or subcontractors as contained herein.

Ind. Code Ann. § 5-16-5.5-1 (West 2007). At most, the second sentence of this definition adds materialmen of subcontractors. Alberici has not contended that it was a materialman to Harmon Steel. What Alberici actually seems to be is a sub-sub-sub-contractor not covered by the Title 8 provisions or the bond written in furtherance of them.

5

combination of same to whom the contractor sublets part of the contract." 105 Ind. Admin. Code 11-1-30.[3] This definition, like the definition in Ind. Code § 4-13.6-1-18, embraces the rule of privity in determining whether a party is a subcontractor.

*C. Federal and Indiana Caselaw.* The parties and amici point us to a number of Court of Appeals decisions, and two helpful U.S. Supreme Court rulings, for insight into the appropriate definition of "subcontractor." All of the cases were decided before the enactment of § 8-23-9-9, so we discuss them to inform our analysis of the legislature's likely intent.

The Miller Act lays out the surety bond requirements for federal public works and construction projects over $100,000. 40 U.S.C.A. § 3131 (West 2007). In <u>Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.</u>, the U.S. Supreme Court defined "subcontractor" while determining whether a second-tier material supplier could recover from the contractor and surety under the Miller Act.[4] 322 U.S. 102, 107-11 (1944). The Court interpreted the Act as limiting surety coverage to parties who deal directly with the contractor or a subcontractor. <u>Id.</u> at 107-08. It declared that "in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen." <u>Id.</u> at 109. The Court also noted that during the formation and adoption of the Miller Act, Congressional discussion consistently distinguished subcontractors from materialmen and laborers, signaling an intent that "subcontractor" should be read narrowly. <u>Id.</u> at 110.

Adding some color to the new rule, the Court held that the contractor, MacEvoy, dealt with a material supplier, who in turn dealt with Tomkins, a second-tier material supplier. Because the middleman was a "material supplier" and not a "subcontractor," Tomkins could not recover on the surety bond. <u>Id.</u> at 108, 110-11.

---

[3] Article 11 implements rules specifically for Ind. Code ch. 8-23-10 (qualifications of bidders for contracts), not ch. 8-23-9 (state highway contracts). Nonetheless, art. 11 involves the same general subject matter as ch. 8-23-9, which has no corresponding regulations. Thus, we rely on art. 11 as persuasive authority.

[4] Throughout this opinion, we use terms like "second-tier" or "third-tier," which refer to the number of degrees of contractual separation an entity has from the general contractor. Thus, a "second-tier" material supplier deals with a party who deals with the contractor. A "third-tier" party deals with a "second-tier" party, and so on.

The Supreme Court relied on the MacEvoy definition of "subcontractor" again some thirty years later. J.W. Bateson Co., Inc. v. United States ex rel. Bd. of Trs. of Nat'l Automatic Sprinkler Indus. Pension Fund, 434 U.S. 586 (1978). With facts similar to the case before us, the Court denied coverage to a third-tier union which should have received dues and benefit funds from a second-tier sprinkler system installer in the construction of a hospital addition. Id. at 587-88, 592-95. The integral issue was whether the sprinkler installer could be considered a "subcontractor" under the Miller Act, which would extend the union coverage under the surety. Id. at 590. The Court reaffirmed the MacEvoy definition and made its implications clear: "[W]hile [the installer] could have claimed against the payment bond . . . the employees of [the installer] were not similarly protected against [the installer's] default, because they did not have a contractual relationship with . . . any . . . 'subcontractor.'" Id. at 591. The Court reasoned that this view was reinforced by other reported decisions and the reasonable expectations of "those concerned with Government projects." Id. at 592-93.

A few relevant Indiana decisions demonstrate how our appellate courts have interpreted § 8-23-9-9 and similar statutory bond provisions. Alberici relies primarily on Title Guaranty, in which a contractor engaged through government contract to build a gravel road failed to pay several laborers and material suppliers. 61 Ind. App. at 270-71, 109 N.E. at 238. The contractor and a bank had independently agreed the bank would pay the laborers and suppliers for their services to the contractor. In turn, the contractor agreed to reimburse the bank. Id. at 275-76, 109 N.E. at 240. When the contractor failed to keep its end of the bargain, the bank sued the surety claiming the bank held the debts formerly held by the laborers and material suppliers. Id. The Appellate Court held, rather, the transactions created a new debt. Id. at 277-78, 109 N.E. at 240. As a result, the question became whether the surety bond covered this new debt. Id. at 279, 109 N.E. at 241.

The Title Guaranty bond language seemed to have been derived from the statute governing road construction surety bonds at the time, 1905 Ind. Acts 556-57.[5] Title Guaranty,

---

[5] Section 74 states in relevant part:

> [W]hich bond shall be for the benefit of any person or corporation who shall suffer loss or damage
> by reason of any failure or neglect of such bidder to . . . perform such work or to carry out the

61 Ind. App. at 281, 109 N.E. at 241. But the bond was further conditioned that the contractors "'shall promptly pay all debts incurred by them in the prosecution of said work, including labor, materials furnished and for the boarding of laborers thereon.'" Id. at 282, 109 N.E. at 241-42. The Court of Appeals created a test for determining which debts this language covered:

> [I]f there are other debts, regardless of their nature or origin, that sustain such an intimate, immediate, and exclusive relation to the building of the road that it may be said that such debts were incurred in the prosecution of that work, they too are covered by the provisions of the bond.

Id. at 279, 109 N.E. at 241. The Appellate Court applied this test and held that the bank's claim fell within the coverage of the bond. Id. at 280-81, 109 N.E. at 241. Contrary to what Alberici contends, this test was not intended for general use in determining the extent of coverage of statutory bonds. Rather, it was invented for interpreting specific bond language that went beyond statutory requirements.

Later, in a case factually identical to the one before us, the Appellate Court affirmed a judgment in favor of the contractor. Republic Creosoting Co. v. Foulkes Contracting Co., 103 Ind. App. 457, 8 N.E.2d 416 (1937). The surety bond involved in the action originated from an act of the 1919 legislature with a provision nearly identical to the modern § 8-23-9-9. Id. at 458, 8 N.E.2d at 416; 1919 Ind. Acts 128. The court held:

> The bond is required by the statute so that those furnishing material to a contractor or subcontractor may receive payment for such material. It cannot be inferred from anything in the statute that when material used in such an improvement is paid for in full by the subcontractor that one who has sold the material to the one from whom the subcontractor purchased it that the bond was ever intended to cover such a situation.

Foulkes, 103 Ind. App. at 460-61, 8 N.E.2d at 417. Clearly, the court's explanation implies a definition of "subcontractor" akin to the MacEvoy definition.

There is considerable tension, if not outright conflict, between Foulkes' description of the appropriate legal doctrine and the description in another opinion on which Alberici relies. In

---

same in any particular, or to pay for any labor or material therefor that shall have been furnished either to him or to any sub-contractor, agent or superintendent under him.

1905 Ind. Acts. 556-57.

State ex rel. Lawson v. Warren Bros. Roads Co., 115 Ind. App. 452, 459-60, 464, 59 N.E.2d 912, 914-16 (1945), the Appellate Court distinguished Foulkes on a minor factual disparity and repeated the "intimate, immediate, and exclusive relation" language from Title Guaranty. On statutory bond language similar to § 8-23-9-9, the court dismissed the significance of privity of contract. Id. at 461-62, 59 N.E.2d at 915.

While there was a doctrinal conflict between Foulkes and Lawson, the outcome was the same: the distant claimant lost. Lawson drove the truck and dumped the rock for use in building a road on behalf of his employer Mid-West Rock Products Corporation, who held a contract with the prime, Warren Brothers Roads Company. Id. at 455, 59 N.E.2d at 913. The court ruled against Lawson, calling him "the employee of a materialman" and thus not a subcontractor, materialman, or laborer covered by the statute. Id. at 462, 59 N.E.2d at 916.

Alberici's reliance on Lawson would be more compelling if Lawson had prevailed. As it is, the doctrinal conflict between the Lawson opinion and the Foulkes opinion does not provide much push in Alberici's direction.

Our analysis of these cases guides us toward a definition of "subcontractor" in line with MacEvoy, and similar to what Title 4 of the Indiana Code and INDOT regulations suggest.

*D. Public Policy.* One final consideration is the impact our decision will have on policy and judicial economy. We presume that the legislature, in writing the statute, intended its language to be applied in a logical manner consistent with public policy and convenience. Common Council of City of Peru v. Peru Daily Tribune, Inc., 440 N.E.2d 726 (Ind. Ct. App. 1982); Marks v. State, 220 Ind. 9, 40 N.E.2d 108 (1942).

Alberici's position ("intimate, immediate, and exclusive relation") seems to be the worst possible administrative outcome. Without a bright line defining where surety coverage extends, contractors would face an incalculable risk of liability for claims made by distantly remote suppliers or laborers on contracts made without contractor approval. Under the highly fact-

intensive Title Guaranty rule, every one of these cases could command judicial resolution, adding significantly to the transactions costs without assuring any equality of treatment.

By contrast, the narrower view of "subcontractor," which limits surety bond coverage to, at most, second-tier laborers and suppliers, fosters relative certainty for all those involved in public construction projects. Particularly for the prime contractor, the narrow definition helps firms to be more confident in their exposure to paying bond claims for the purpose of submitting a bid. The definition also promotes direct relationships between the contractor and entities performing work for the project, giving the contractor more oversight and control.

*E. Implications.* We believe the Title 4 definition of "subcontractor," explained and elaborated on by MacEvoy, is the most likely definition intended by the legislature for Ind. Code § 8-23-9-9. Accordingly, a "subcontractor" is any person or organization entering into a contract with a contractor to furnish labor and materials used in the actual construction of a state highway project. A pure material supplier or laborer is not a subcontractor. Thus, § 8-23-9-9 does not extend coverage under a performance bond to any entity more remote than a second-tier laborer or material supplier.

Our holding does not mean that remote parties who work on a state highway project are left without any device to ensure payment. A remote participant like Alberici could, for example, demand advance payment or some form of financial undertaking before delivering the bridge pieces. Such a contractual provision is entirely reasonable given the significance of the manufactured product.

Furthermore, nothing in the Indiana Code prevents contractual arrangements that extend the coverage of a performance bond to protect remote parties. If the General Assembly desires to require coverage of remote parties, amending § 8-23-9-9 will be a relatively straightforward matter.

**Conclusion**

We hold that for purposes of Ind. Code § 8-23-9-9, "subcontractor" is any person or organization entering into a contract with a contractor to furnish labor and materials used in the actual construction of a state highway project. Accordingly, a claimant who does not share privity of contract with the contractor or a subcontractor is not entitled to the coverage of a performance bond issued under § 8-23-9-9.


Sullivan, Boehm, and Rucker, JJ., concur.

Dickson, J., dissents without separate opinion.