908 F.2d 375
 36 Cont.Cas.Fed. (CCH) 75,988
 UNITED STATES of America, for the Use and Benefit of MORRIS
CONSTRUCTION, INC., Appellee,
v.
AETNA CASUALTY INSURANCE COMPANY; Lamro, Inc., and Schultz
& Sons Construction Company, Appellants.
 No. 88-5467.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1989.
Decided July 13, 1990.
 
 John O. Holm, Rapid City, S.D., for appellants.
 Robert L. Varilek, Rapid City, S.D., for appellee.
 Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BROWN,* Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Morris Construction, Inc., entered into an oral agreement with Schultz & Sons Construction Company to provide heavy equipment for a road construction project on which Lamro, Inc., was the general contractor. After Schultz failed to pay Morris money that was owed under the oral agreement, Morris brought this claim under the Miller Act, 40 U.S.C. Secs. 270a-d (1982), against Lamro, Schultz, and the issuer of Lamro's payment bond, Aetna Casualty Insurance Company. The principal issue in this appeal is whether Schultz was a subcontractor for the purposes of the Miller Act. The district court[1] entered a judgment for Morris after concluding that Morris was a subcontractor of Schultz and that Schultz was a subcontractor of Lamro. We affirm the district court judgment.
 
 
 2
 Lamro contracted with the Bureau of Indian Affairs to work on a twelve mile section of highway south of Scenic, South Dakota, in the Pine Ridge Indian Reservation. Lamro is a construction contracting firm which has no construction capabilities but, as found by the district court, sustains itself by complying with an Oglala Sioux Tribal Ordinance designed to promote the ownership and management of businesses by Native Americans. Lamro first contracted to have Ramsdell Construction perform certain work, but Ramsdell defaulted on the contract. Thereafter, Lamro executed an agreement to lease construction equipment from Schultz. Schultz and Morris then orally agreed that Morris would provide equipment and operators to work on the project. The equipment operators, employees of Morris, were to be under the control and supervision of Lamro, and were to be paid by Lamro. Schultz failed to pay Morris money that was owed under their contract, and Morris filed this claim under the Miller Act.
 
 
 3
 The case was tried to the district court, which found for Morris. The court recognized that the primary issue before it was whether Schultz was a subcontractor or a mere materialman for the purposes of the Miller Act, because Morris could recover only if Schultz was a subcontractor. To answer that question, the court looked to the Supreme Court's decisions in Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944); F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); and J.W. Bateson Co. v. United States ex rel. Board of Trustees, 434 U.S. 586, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978). The court focused particularly upon the Supreme Court's declaration that a subcontractor is "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." MacEvoy, 322 U.S. at 109, 64 S.Ct. at 894. The court then analyzed the facts before it and found that Schultz was a subcontractor of Lamro, the prime contractor. Even though the contract between Lamro and Schultz was denominated an "equipment lease agreement," the court held that it was actually a subcontract requiring Schultz to perform a major part of the labor and material requirements of the original contract by supplying special heavy equipment and trained operators. The equipment rental agreement required Lamro to supply and pay the equipment operators, but the district court found that part of the agreement to be a sham because Lamro did not employ any heavy equipment operators when the contract was signed. The district court found that there was an implicit understanding between Schultz and Lamro that Schultz would be supplying all of the labor and equipment necessary to complete a specified portion of the road construction project, with Lamro paying the workers directly and paying Schultz separately for the equipment rental. Schultz also contracted with Morris.
 
 
 4
 On appeal, Lamro and Aetna argue that Schultz was merely a materialman rather than a subcontractor. Therefore, they argue that Morris was not entitled to recover under the Miller Act.
 
 I.
 
 5
 The Miller Act provides, in relevant part, that:
 
 
 6
 Every person who has furnished labor or material in the prosecution of the work provided for [in a government contract that is covered by the Miller Act] ... shall have the right to sue on [the prime contractor's] payment bond ...: Provided, however, That any person having [a] direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving [the specified notice].
 
 
 7
 40 U.S.C. Sec. 270b(a).
 
 
 8
 From the Act's proviso, the Supreme Court has inferred two limitations on the protection afforded by the Act. First, a contractual relationship with either the prime contractor or a subcontractor is a prerequisite to recovery under the Act; plaintiffs who have contracted only with a sub-subcontractor are not entitled to recover under the Miller Act. Bateson, 434 U.S. at 594, 98 S.Ct. at 877. Second, the Act does not protect those who contract with a "materialman," or supplier, rather than with a subcontractor. Rich, 417 U.S. at 121-24, 94 S.Ct. at 2161-63; MacEvoy, 322 U.S. at 107-11, 64 S.Ct. at 893-96. The distinction between a materialman and a subcontractor is the issue in this case.
 
 
 9
 In MacEvoy, the Court held that, for the purposes of the Miller Act, a subcontractor is "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." 322 U.S. at 109, 64 S.Ct. at 894. The Court indicated that the distinction between materialmen and subcontractors was supposed to promote appropriate risk allocation. Id. at 110-11, 64 S.Ct. at 895-96.
 
 
 10
 In Rich, the Court reemphasized the economic policy that was mentioned in MacEvoy. Thus, while the Court repeated MacEvoy's definition of a subcontractor, the Court also stated that whether an entity is a subcontractor or a supplier depends upon "the substantiality and importance of [its] relationship with the prime contractor." Rich, 417 U.S. at 123, 94 S.Ct. at 2162. Whether a relationship is sufficiently substantial and important to justify treatment as a subcontractor depends upon whether the prime contractor could have easily protected itself from liability by requiring "bond security or other protection." Id. at 123-24, 94 S.Ct. at 2162-63.
 
 
 11
 When considered together, Bateson, MacEvoy, and Rich stand for the proposition that a company is a subcontractor if: (1) it has contracted to supply labor or material to the prime contractor; and (2) it plays a sufficiently substantial role in the construction project that the general contractor could have negotiated to have the subcontractor assume the risk of the subcontractor's default. The district court in this case followed these standards and concluded that Schultz was a subcontractor.
 
 II.
 
 12
 Lamro and Aetna, in challenging the district court's conclusion that Schultz was a subcontractor for the purposes of the Miller Act, do not discuss whether this is a factual or legal issue, and thus subject to the clearly erroneous standard or de novo review.[2] Our independent study of the cases on this question has not been particularly illuminating, but we believe that the ultimate issue of whether Schultz was a subcontractor under this Act is a mixed question of law and fact that should be reviewed de novo. See Besta v. Beneficial Loan Co., 855 F.2d 532, 533 (8th Cir.1988) (stating that "[o]n mixed questions of law and fact, at least concerning federal law, this circuit exercises plenary review of the legal conclusion").[3] The conclusion at issue was reached by the district court after detailed factual analysis, and we have no doubt that the court's findings of historical fact must be reviewed, insofar as they are attacked, under the clearly erroneous standard. We recognize that some issues in Miller Act cases have been considered factual ones, such as the terms of an oral agreement in Mike Bradford & Co. v. F.A. Chastain Construction, 387 F.2d 942, 943 (5th Cir.1968), and whether an agreement was one for the lease or purchase of equipment in Boyd Callan, Inc. v. United States ex rel. Steves Industries, 328 F.2d 505, 508 (5th Cir.1964). On the other hand, we read the Bateson, MacEvoy, and Rich cases to engage in a legal analysis in reaching a conclusion concerning whether the party was a subcontractor under the Act.[4]
 
 III.
 
 13
 Lamro and Aetna make a number of arguments directed to the district court's conclusion that Morris was a subcontractor of Schultz, who, in turn, was a subcontractor of Lamro. The district court found that "Lamro hired Schultz for the purpose of performing a specific part of the labor and material requirements of the original road construction contract." (District Court Opinion at 14-15). This finding tracks the Supreme Court's definition of a subcontractor in MacEvoy. See 322 U.S. at 108-09, 64 S.Ct. at 894-95. The court also found that "Lamro could have protected itself since it could have easily required bond security or other protection from Schultz." (District Court Opinion at 15). This finding satisfies the policy concerning risk allocation that the Supreme Court identified in Rich and MacEvoy. See Rich, 417 U.S. at 123-24, 94 S.Ct. at 2162-63; MacEvoy, 322 U.S. at 110, 64 S.Ct. at 895. Finally, the court found that Morris contracted to lease equipment to Schultz. (District Court Opinion at 15). These factual findings support the conclusion that Schultz was a subcontractor for the purposes of the Miller Act.
 
 
 14
 Lamro and Aetna argue that Schultz was not a subcontractor of Lamro, but rather only a lessor of equipment. They flesh out their argument by stressing that the equipment that was leased was neither unique nor specialized, that Schultz took over no part of the contract, and that Schultz played no supervisory role over Morris. They conclude by asserting that because Schultz was not a subcontractor of Lamro, and because Morris was not in privity with Lamro, Morris was not entitled to assert a claim under the Miller Act. These arguments, developed in Lamro and Aetna's opening brief, do not attack the district court's findings of fact and, as best we can discern them, are directed at the court's conclusion that Schultz was a subcontractor. The district court's findings are contrary to these arguments and fully answer them. The district court found that Schultz took over part of the contract, supervised Morris, and provided specialized equipment.
 
 
 15
 Lamro and Aetna argue, on several occasions, that there was no showing of privity between Morris and Lamro. The short answer to this argument is that the Miller Act plainly provides that a person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor shall have a right of action on the payment bond. Here the district court found that Schultz was a subcontractor and that Morris had a direct contractual relationship with Schultz. The Lamro-Aetna argument based on the requirement of direct privity between Morris and Lamro finds its complete answer in the statute. The arguments asserted by Lamro and Aetna do not convince us that the district court erred in determining that Schultz was a subcontractor, or that Morris subcontracted with Schultz, thereby entitling Morris to recover under the Miller Act.
 
 
 16
 Lamro and Aetna also argue that the district court's decision in this case is inconsistent with cases where multi-factor tests were used to define the term subcontractor. See United States ex rel. Consolidated Pipe & Supply Co. v. Morrison-Knudsen Co., 687 F.2d 129, 134 (6th Cir.1982); Aetna Casualty & Sur. Co. v. United States ex rel. Gibson Steel Co., 382 F.2d 615, 617-18 (5th Cir.1967). We need not consider that argument in detail, because we conclude that the district court's analysis is consistent with the Supreme Court precedents that we have discussed.
 
 IV.
 
 17
 Lamro and Aetna, for the first time in their reply brief, challenge as clearly erroneous a number of factual findings. We have on several occasions declined to consider such arguments. See, e.g., Mississippi River Corp. v. FTC, 454 F.2d 1083, 1093 (8th Cir.1972). We consider the arguments here, particularly with respect to the relationship between Morris, Schultz and Lamro, simply to demonstrate that these arguments are utterly lacking in merit.
 
 
 18
 We have set out the district court's findings of fact above at some length. Our study of the transcript convinces us that there is evidence to support these findings. Mitch Morris, head of Morris Construction, specifically testified about the contractual arrangements between Schultz and Lamro, and this testimony provided the foundation for the district court's findings. Morris described the verbal agreement between Morris Construction and Schultz, and he stated that Schultz had contracted to work on six miles of the project. (Tr. 18). He testified that he had done not only excavating and road work on the project, but also pipe work. (Tr. 21). He specifically stated that he was to make sure that his machine and men were ready to do the work that was to be directed by Lamro and Schultz. (Tr. 29). He also said, however, that his only obligation was to make sure that the equipment was there and operating. (Tr. 30). That conflict in testimony was to be resolved by the district court.
 
 
 19
 The finding that the operators were to be directed by Lamro and Schultz is firmly supported by other testimony of Morris, so that we cannot conclude the district court clearly erred in making this determination. Morris' men were paid by Lamro and turned their time cards into Lamro, but Morris paid the workers additional amounts when he felt that Lamro had not paid them for all of their work. (Tr. 31). Significantly, Morris testified that his hourly billing rate included the cost of operators, (Tr. 39), and that he gave Lamro a credit for payroll payments made by Lamro, (Tr. 24). Morris stated that he received direction on the project from Schultz and from Joe Jagodzinski, Lamro's project superintendent. (Tr. 37). Morris stated that Lamro wanted to directly pay his employees so that it could comply with the preferences contained in the Tribal Ordinance. (Tr. 38). When Morris went on the job, he thought that Schultz had a subcontract and was to be paid according to unit prices for the various line items in its bid. (Tr. 38). Morris believed that Schultz wanted Morris to help perform the work. (Tr. 38). Morris and Schultz finally separated the bid, with Schultz being paid according to line items and Morris working for Schultz by the hour. (Tr. 39). Schultz came to Morris' office once when they were trying to come up with prices and had a piece of paper that established line item prices. (Tr. 42). Morris originally thought that Schultz was to subcontract six miles of the road job, but Schultz wasn't on the job very often. (Tr. 40).
 
 
 20
 Charles Columbe, the President and Chief Executive Officer of Lamro, acknowledged that Lamro had indicated in a computer printout labeled "Schultz & Sons, Rockyford Road" that line item work between certain stations on the highway had been "assigned to Schultz and Sons Construction." (Tr. 65-66). In addition, certain pipe removal was enumerated at a fixed price per unit or per linear foot. (Appellee's App. A at 1).
 
 
 21
 The computer printout strongly corroborates Morris' testimony. The printout plus the fact that Schultz succeeded to Ramsdell, who had entered into a detailed subcontract with Lamro, adequately support both the district court's finding that there was a contract between Lamro and Schultz requiring Schultz to perform a portion of the work on the project and its finding that Schultz, in turn, had subcontracted all or a major portion of this work to Morris.
 
 
 22
 We need not further lengthen this opinion by detailed consideration of the other factual arguments asserted, but they have been considered and are rejected.
 
 
 23
 The judgment of the district court is affirmed.
 
 
 
 *
 The HONORABLE JOHN R. BROWN, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 The Honorable Richard H. Battey, United States District Judge for the District of South Dakota
 
 
 [2]
 Morris, in arguing that the findings of the district court were not clearly erroneous, seems to assume that the clearly erroneous standard should govern this question
 
 
 [3]
 Professors Wright and Miller have stated that:
 Many issues in a law suit involve elements of both law and fact. Whether these be referred to as mixed questions of law and fact, or legal inferences from the facts, or the application of law to the facts, there is substantial authority that they are not protected by the "clearly erroneous" rule and are freely reviewable.
 
 
 [9]
 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2589, at 753 (1971)
 
 
 [4]
 We discussed the distinction between questions of law and fact with respect to the meaning of different phrases in In re McCrary's Farm Supply, 705 F.2d 330, 332 (8th Cir.1983); see also Commissioner v. Duberstein, 363 U.S. 278, 289-91, 80 S.Ct. 1190, 1198-1200, 4 L.Ed.2d 1218 (1960). We are satisfied that the term subcontractor has a sufficiently technical or functional meaning developed in the construction industry that it is inaccurate to say that it is a non-technical statutory standard that should be reviewed under the clearly erroneous rule. The Supreme Court in MacEvoy looked to the "technical meaning, as established by usage in the building trades" of the term subcontractor, and discussed the legislative history in determining the distinction between subcontractors, materialmen, and laborers. 322 U.S. at 108-10, 64 S.Ct. at 894-95. Rich referred to this approach in MacEvoy as adopting "a functional rather than a technical definition for the term subcontractor." Rich, 417 U.S. at 123, 94 S.Ct. at 2162. We hasten to add that if the nature of this relationship is sufficiently factual that it should be reviewed on a clearly erroneous basis, the thorough examination of the factual background of this issue by the district court would be more than adequate support for its ultimate conclusion that Schultz was a subcontractor