921 F.2d 741
 36 Cont.Cas.Fed. (CCH) 75,992
 UNITED STATES of America for the Use and Benefit of RAMSDELL
CONSTRUCTION, Appellee,
v.
AETNA CASUALTY INSURANCE COMPANY; Lamro, Inc., Appellants,
Schultz & Sons Construction Company.
 Nos. 89-5127, 89-5149.
 United States Court of Appeals,
Eighth Circuit.
 Submitted July 13, 1990.
Decided Dec. 10, 1990.
 
 John Holm, Rapid City, S.D., for appellants.
 John LaFleur, Rapid City, S.D., for appellee.
 Before ARNOLD, JOHN R. GIBSON, and WOLLMAN, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Ramsdell Construction sued Lamro, Inc., prime contractor on a road project on the Pine Ridge Indian Reservation, and its bonding company, Aetna Casualty Insurance Company, under the Miller Act, 40 U.S.C. Sec. 270a et seq. (1988), claiming that Lamro had not paid Ramsdell for work and equipment supplied on the project. Lamro counterclaimed for overpayments made to Ramsdell. The district court entered judgment for Ramsdell and against Aetna and Lamro for $34,135.16, plus prejudgment interest of $11,551.12 and dismissed Lamro's counterclaim. United States ex rel. Ramsdell Const. v. Aetna Cas. Ins. Co., No. CIV87-5134 (D.S.D. Feb. 8, 1989), slip op. at 18. All parties have appealed. We affirm the district court's order, except that we remand to the district court to enter a specific finding of fact on one aspect of Lamro's counterclaim.
 
 
 2
 Lamro was the primary contractor under a contract with the Bureau of Indian Affairs for a twelve-mile road project south of Scenic, South Dakota, known as the Rockyford Project. The district court found Lamro had no construction capabilities, but existed by virtue of its status as a Native American owned and managed business, which qualified it for preferential treatment under Oglala Sioux Tribal Ordinance No. 84-08. Slip op. at 2. Its practice is to bid on contracts subject to the Ordinance and then to enter subcontracts with other companies to do the construction work. Id.
 
 
 3
 Accordingly, Lamro entered two contracts with Ramsdell dated May 1, 1986, relating to the Rockyford Project. One contract explicitly required Ramsdell to perform Line Item 311(4) of the general contract, which consisted of removing and stockpiling the existing surface of the roadway. The district court held that the second contract, though styled "Equipment Rental Agreement," obliged Ramsdell to accomplish various other bid items on the project, except paying labor and culvert costs for those items, which Lamro would do directly. The district court found that the purpose of this oblique method of contracting was to meet requirements of the Bureau of Indian Affairs and the tribal employment rights ordinance requiring a qualifying company (Lamro) to do the work, though Lamro had no construction capabilities of its own. Slip op. at 2, 4-6.
 
 
 4
 There were problems on the project. First, there was a major design error in the project, and work was suspended from August 7 to August 19, 1986 while the error was corrected. During this time, Ramsdell had equipment idle at the job site. The specifications for the project provided for compensation in such an event. Lamro made a claim for the standby equipment costs to the Bureau of Indian Affairs and received at least partial compensation for the standby time.
 
 
 5
 Secondly, well into the project, Ramsdell began to have difficulty accomplishing the work in a timely manner due to equipment breakdowns and capital shortages. As the project's contract deadline loomed near, Lamro gave up on Ramsdell and hired two firms, Schultz & Sons Construction and Rapid Construction, to complete the construction.
 
 
 6
 Lamro and Ramsdell entered into a new contract dated September 22, 1986, which obliged Ramsdell to complete work under Line Item 304(7) of the general contract. Ramsdell's task under this subcontract was to replace recycled gravel on the road subbase, but Lamro was obliged to pay the labor and fuel expenses.
 
 
 7
 Importantly, the September 22, 1986 contract contained an addendum that in turn contained an "Agreement and Release" dated October 1, 1986. The Agreement and Release purported to release the parties from all existing claims against each other arising out of the May 1, 1986 "Equipment Rental Agreement," except for payment due Ramsdell for the part of the contract already completed but not yet paid for.
 
 
 8
 Besides Ramsdell's claims arising out of the two sets of contracts (May 1 and October 1, 1986) directly between Lamro and Ramsdell, there is also a claim arising out of dealings between Ramsdell and Schultz.[1]
 
 
 9
 Schultz and Ramsdell entered a contract having to do with "soft spot work." This was work additional to that covered by the original Rockyford Project contract, made necessary by the appearance of "soft spots" on the job site that resulted from water accumulation. The Bureau of Indian Affairs agreed to pay additional compensation to correct this problem, and Lamro contracted with Schultz to perform the work. Schultz, in turn, contracted with Ramsdell to provide labor, equipment and supplies for the work. Ramsdell completed its work on the soft spots on December 16, 1986. The total amount due Ramsdell for soft spot work was $34,135.16. Schultz did not pay Ramsdell, so Ramsdell hand delivered a Miller Act notice of its claim to Lamro, dated March 11, 1987.
 
 
 10
 Ramsdell sued Lamro for the amounts due for its equipment standing idle from August 7-19, 1986 and for the amount due it for its work on the soft spots under its contract with Schultz. Lamro counterclaimed for overpayments under the May 1, 1986 "Equipment Rental Agreement" and the May 1 Line Item 311(4) subcontract.
 
 
 11
 The district court held that Ramsdell had released its claim for standby equipment in the October 1, 1986 Agreement and Release. Slip op. at 15. However, the court held that Ramsdell was entitled to the amounts it claimed for the soft spot work ($34,135.16) and awarded Ramsdell that amount, plus prejudgment interest. Id. at 18. The court did not explicitly discuss Lamro's counterclaims, but simply failed to award Lamro anything on the claims. Lamro interprets the trial court's discussion of the release as a finding that Lamro's claims were released by the October 1 Agreement. Lamro's Brief at 29.
 
 
 12
 On appeal, Lamro argues that Ramsdell's soft spot claim is not protected under the Miller Act, because Ramsdell did not serve on Lamro the necessary Miller Act notice, see 40 U.S.C. Sec. 270b(a), of its soft spot claim, and because Schultz was not a subcontractor on the job. Lamro also argues that the district court erred in holding that it released its claims for overpayments. Ramsdell also appeals, arguing that it did not release its claim for the standby equipment.
 
 
 13
 We begin by observing that we decided that Schultz was a subcontractor on the Rockyford Project in the Morris case, 908 F.2d at 379. See Ramsdell, slip op. at 16. The requirements for collateral estoppel are met in this case, see generally Lane v. Peterson, 899 F.2d 737, 741 (8th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990), and Aetna and Lamro are therefore bound by the Morris result.
 
 
 14
 Lamro's notice argument serves it no better. Under the clearly erroneous standard of Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985), the district court's choice of two permissible versions of the facts cannot be reversed. Here, Lamro cites evidence in the record tending to show that it never received a Miller Act notice of Ramsdell's soft spot claim. There is, however, also evidence that due notice of the claim was hand delivered to Lamro on March 11, 1987, Tr. at 68, and a "received" stamp bearing that date appears on the notice. Tr. at 227-28. The district court did not err in finding Ramsdell fulfilled the Miller Act notice requirements or awarding Ramsdell damages on its soft spot claim.
 
 
 15
 Lamro next argues that the district court erred in holding its two claims for overpayment against Ramsdell were released by the October 1 Agreement. "[W]here no extrinsic evidence is necessary to determine the intent of the parties, and where the intent is implicit from the agreement and from its context, the legal effect of the agreement is properly resolved by the courts as a matter of law." Langer v. Iowa Beef Packers, Inc., 420 F.2d 365, 367-68 (8th Cir.1970). We therefore review de novo Lamro's attacks on the district court's construction of the October 1 Agreement. Lamro's first claim consists of $51,130.57 in payments it made to third parties after October 1 in satisfaction of their claims against Ramsdell for repairs to equipment used on the project during the term of the May 1 "Equipment Rental Agreement." Ex. 102; Tr. at 263. Lamro argues that these claims did not arise under the "Equipment Rental Agreement" but under the Miller Act instead, and therefore the claims were not released by the October 1 release of "all past, present, or future claims, obligations, debts, or liability arising out of said First Lease, or arising out of any work completed, or left uncompleted, on the Project (subject only to [an inapplicable exception]." See Ex. 6 at 2.
 
 
 16
 The clear language of the release applies to all claims arising out of the May 1 Equipment Rental Agreement. Lamro's claim against Ramsdell for reimbursement for repair costs clearly "arose out of" the relationship created by the May Equipment Rental Agreement. In fact, Lamro itself refers in its brief to this sum as money it paid "on the equipment lease." Lamro Br. at 28. Therefore, we hold that Lamro's counterclaim for $51,130.57 was released by the October 1, 1986 Agreement and Release.
 
 
 17
 Lamro's second counterclaim is for $13,513.13, for amounts paid to other contractors to finish the work Ramsdell was obligated to perform under the May 1 subcontract to complete Line Item 311(4). Ex. 101 at 2, Tr. at 201-10. The findings of fact are silent on this issue. We do not believe the district judge meant to hold implicitly that this claim was released under the October 1 release, because at trial he seemed to express the opinion that the Line Item 311(4) subcontract was not affected by the October 1 release. Tr. at 241-42. The language the court quoted during the trial from the October 1 Agreement would support such a conclusion, since it indicated that the October 1 release pertained only to the May 1 "Equipment Rental Agreement." Since we are unable to determine the ruling of the district court on Lamro's second counterclaim, we certify the question to the district court to clarify the findings in this respect. See Miller v. Patton-Tully Transp. Co., 851 F.2d 202, 206 (8th Cir.1988).
 
 
 18
 Ramsdell in turn attacks the district court's holding that the October 1, 1986 Agreement released Ramsdell's claim for the standby equipment. Ramsdell has admitted that the standby claim arose under the May 6 "Equipment Rental Agreement." Tr. at 225. It therefore follows that the plain language of the October 1 Agreement released the claim.
 
 
 19
 At trial, Ramsdell sought to vary the terms of the October 1 Agreement by proving that during negotiations on the written agreement, the parties had entered an oral agreement that Ramsdell would still have a claim for the standby damages, notwithstanding the written release. The district court held that the claim was released, since the October 1 Agreement did not exclude the standby claim from the release. Slip op. at 15. See S.D. Codified Laws Sec. 53-8-5 (1980) (codifying parol evidence rule). Ramsdell now argues that even though the alleged oral agreement is otherwise excludable under the parol evidence rule, it is nevertheless admissible because the written release was induced by fraud. The only fraud Ramsdell points to is the alleged oral side agreement, which supposedly directly contradicted the terms of the written release. As did the defendant in Moncur v. Jones, 72 S.D. 202, 31 N.W.2d 759 (1948), Ramsdell "says that the settlement agreement is as it should have been but that by another deal it was orally agreed that the parties should treat the subject matter not at all in accordance with the plain meaning of the written expressions. We think that [it] cannot by this approach destroy the effect of [its] written memorial...." Id. 31 N.W.2d at 764-65. The district court did not err in holding that Ramsdell's claim of a side agreement contradicting the written agreement was barred by the parol evidence rule.
 
 
 20
 We affirm the district court's order in all respects, except that we remand for the district court to clarify its holding on Lamro's claim for $13,513.13 on the Line Item 311(4) subcontract. We retain jurisdiction of this appeal for further consideration when the district court files its further findings with the Clerk of this Court. See Miller, 851 F.2d at 206.
 
 
 
 [1]
 Schultz also entered a contract for part of the project with Morris Construction. The Morris contract resulted in another Miller Act claim, which we have recently decided. United States ex rel. Morris Const. v. Aetna Cas. Ins. Co., 908 F.2d 375 (8th Cir.1990)