UNITED STATES of America, for the Use and Benefit of GLOBAL BUILDING SUPPLY, INCORPORATED, Plaintiff-Appellant,

v.

WNH LIMITED PARTNERSHIP; Thomas P. Harkins, Incorporated; Harkins Builders, Incorporated; the Federal Insurance Company, Defendants-Appellees,

and

Toledo Drywall, Incorporated, Defendant.

UNITED STATES of America, for the Use and Benefit of SUPERIOR SUPPLY ASSOCIATES, INCORPORATED, Plaintiff-Appellant,

v.

WNH LIMITED PARTNERSHIP; Thomas P. Harkins, Incorporated; Harkins Builders, Incorporated; Toledo Drywall, Incorporated; Today Contractors, Incorporated; the Federal Insurance Company, Defendants-Appellees.

Nos. 92-1467, 92-1775.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1993.

Decided June 9, 1993.

Robert Keith Richardson, Odin, Feldman & Pittleman, P.C., Fairfax, VA, argued, for plaintiff-appellant.

David Charles Hjortsberg, Reese & Carney, Columbia, MD, argued, for defendants-appellees.

Before PHILLIPS and NIEMEYER, Circuit Judges, and RESTANI, Judge, United States Court of International Trade, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

The Miller Act, 40 U.S.C. § 270a *et seq.*, requires persons awarded substantial public works contracts with the United States to post a payment bond protecting some of those supplying the contract's labor and materials from defaults in payment. In this case we consider whether two materials suppliers victimized by such a default can lay claim to the bond or whether they are too distant from the party contracting with the government to do so. The district court took the latter view, and we affirm its summary judgment rejecting their claims.

## I

In September of 1989, Thomas P. Harkins, Inc. (Harkins Inc.) contracted with the United States Navy to construct and lease a large apartment complex. Harkins Inc. had been organized in 1965. At the time of contracting, its shareholders were its president, J.P. Blase Cooke, and its chairman, Thomas P. Harkins (Harkins).

Harkins and Cooke later formed another entity to execute the project, WNH Limited Partnership. They installed Harbor Land Company—a corporate shell wholly owned by Harkins—as the general partner and themselves as limited partners. Harbor Land Company held only one percent of the partnership; Harkins and Cooke owned the remainder. On May 10, 1990, WNH assumed Harkins Inc.'s obligations under the lease/construction contract with the Navy pursuant to agreements among WNH, Harkins Inc., and the United States; Harkins Inc. remained involved in the contract solely as guarantor of performance for WNH.

That same day WNH also contracted with another entity, Harkins Builders, Inc.[1] (Builders), to construct the complex, thereby subcontracting a substantial portion of WNH's total contractual obligation to the Navy. Organized in 1974, Builders is wholly owned by its chairman, Harkins, and its president, Cooke.

A week later WNH posted the payment bond required by the Miller Act, with Federal Insurance Company as surety. Federal had conditioned its agreement to serve as surety on execution of an indemnity agreement by all members of the Harkins Group, which included Harkins Inc., WNH, Builders, and two other corporate entities not otherwise relevant here. Shortly thereafter Builders commenced construction. In late 1990 and early 1991 it retained Today Contractors, Inc. and Toledo Drywall, Inc. to furnish and install drywall on the project. Global Building Supply, Inc., one of the plaintiffs-appellants here, supplied materials to Toledo. Superior Supply Associates, Inc., the other plaintiff-appellant, supplied materials to Toledo and Today.

1. At the time it was called Harkins CM, Inc.

Neither supplier was paid. Consequently, both sued. Global sought relief against Toledo on the supply contract and also brought a use-suit against Harkins Inc., WNH, Builders, and Federal (as surety) on the Miller Act payment bond; Superior filed a similar claim on amounts owed it by both Toledo and Today. Following submission of stipulated exhibits, memoranda, and oral argument in the Global suit, the district court entered a default judgment for Global on its contract claim against Toledo but also granted summary judgment for Harkins Inc., WNH, Builders, and Federal on the Miller Act claim, holding that Global's relationship to WNH was of too remote a degree to permit recovery under the Miller Act. Superior agreed to rest on Global's exhibits and arguments and submitted its case on the briefs. The district court granted summary judgment for Superior on its contract claims against Toledo and Today but once again, and for identical reasons, granted summary judgment for Harkins Inc. and its associates on the Miller Act claim.

Both Global and Superior appealed the grants of summary judgment for Harkins Inc., WNH, Builders, and Federal on the Miller Act payment bond. Global also appealed the district court's denial of its own motion for summary judgment on the Miller Act claim, but Superior filed no equivalent motion. We consolidated the two appeals at the request of all parties.

## II

### A

In reviewing the district court's decision, we apply the same standard it did, viewing all facts and inferences in the light most favorable to the nonmovant to determine whether summary judgment was appropriately granted. *Moore v. Winebrenner*, 927 F.2d 1312, 1313 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991). The Miller Act protects those who furnish labor or material for substantial federal public works contracts from defaults in payment by compelling the party

awarded the government contract (the "contractor") to post a payment bond against which the suppliers of labor or materials may claim in the event of such a default. 40 U.S.C. § 270a(a)(2), 270b(a). This provides laborers and materialmen on federal projects with a substitute for the common law materialman's lien and its relatives, which can't attach to federal property.[2] *J.W. Bateson Co. v. United States ex rel. Board of Trustees,* 434 U.S. 586, 589, 98 S.Ct. 873, 875, 55 L.Ed.2d 50 (1978).

The statute doesn't apply to everyone who supplies labor or materials toward the completion of the federal public works contract, however; it's limited to those who "deal directly with the prime contractor" and those who "have [a] direct contractual relationship with a subcontractor."[3] *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.,* 322 U.S. 102, 107, 64 S.Ct. 890, 894, 88 L.Ed. 1163 (1944). Global and Superior claim no express or implied contractual relationship with the prime contractor in this case; instead, they assert direct relationships with the "subcontractors" Toledo and Today.

*Bateson,* however, essentially limited statutory "subcontractors" to first-tier subcontractors, *i.e.* those having direct contractual relations with the prime contractor. 434 U.S. at 594, 98 S.Ct. at 877.[4] That means parties other than first-tier subcontractors and those having direct contractual relations with them are too remote to recover under the statute. This poses problems for Global and Superior, because a formal approach to this case would label WNH the prime contractor, Builders the subcontractor, and Toledo and Today second-tier subcontractors. Global and Superior only had contracts with Toledo and Today, so this approach would

identify them as third-tier subcontractors, placing the Miller Act payment bond posted by WNH beyond their reach.

Not surprisingly, Global and Superior seek to avoid this harsh result by taking a different tack. They argue for a functional, rather than formal, definition of "prime contractor" that, given the inbred nature of the contractual relationships here and the alleged virtual identity of WNH and Builders, would collapse those two entities into one prime contractor. That would bring Global and Superior within reach of the payment bond by transforming Toledo and Today into first-tier subcontractors, leaving Global and Superior in the position of second-, rather than third-, tier subcontractors. We reject this approach, for the reasons that follow.

### B

Global and Superior correctly assert that the Miller Act's remedial purposes require liberal construction and application. *MacEvoy,* 322 U.S. at 107, 64 S.Ct. at 893. That liberality animated the Supreme Court's construction of the Act in *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), heavily relied on by Global and Superior, wherein the Court adopted "a functional rather than a technical definition for the term subcontractor" focusing on "the substantiality and importance of [the entity's] relationship with the prime contractor." *Id.* at 123, 94 S.Ct. at 2162. *Rich* involved a Miller Act payment bond claim by Industrial Lumber Company, which had supplied plywood to Cerpac Company for ultimate provision to the F.D. Rich Company, a government contractor. *Id.* at 118–20, 94 S.Ct. at 2159–61. Relying on *MacEvoy's*

---

2. Because WNH owns the project here and merely leases the complex to the government, it appears that those remedies were actually available to Global and Superior in this case. *See* Va.Code Ann. § 43–1 *et seq.*

3. Claims by the latter group also require provision of timely notice of claim to the prime contractor, 40 U.S.C. § 270b(a), but that's not contested here.

4. Moreover, all who have direct contractual relations with the prime contractor aren't "subcontractors"; the term includes only those who "perform[ ] for and take[ ] from the prime contractor a specific part of the labor or material requirements of the original contract." *MacEvoy,* 322 U.S. at 109, 64 S.Ct. at 894. Ordinary laborers and materialmen don't qualify. *Id.* Appellees don't deny that Toledo and Today were performing a specific part of the original contract, however; they claim only that Toledo and Today were second-tier subcontractors rather than first-tier ones.

holding that a direct contractual relationship with a mere supplier of—rather than subcontractor for—the prime contractor doesn't permit recovery under the Miller Act, Rich argued that its plywood supply contract with Cerpac, for the satisfaction of which Industrial had been retained, rendered Cerpac a supplier and therefore barred Industrial's recovery on the bond. *Id.* at 122, 94 S.Ct. at 2161. Unlike the supplier in *MacEvoy,* however, Cerpac had *two* contracts with Rich arising out of the latter's government contract. Although one was the simple plywood supply contract described above, the other was more involved, calling for Cerpac to select, modify, detail, and install custom millwork on the government project. *Id.* at 119, 94 S.Ct. at 2160. With this in mind, Industrial argued that the Court should consider the entirety of Cerpac's relationship with Rich and find it a subcontractor under the Act. The Court agreed, finding that the commonality of ownership, the conduct of prior dealings, and the multiplicity of contracts between Cerpac and Rich rendered the former a subcontractor, and not merely a supplier, of the latter. *Id.* at 124, 94 S.Ct. at 2162.

Taken together, *MacEvoy, Rich,* and *Bateson* present a functional approach to distinguishing first-tier "subcontractors" from other entities contracting with the prime contractor circumscribed by bright-line rules barring recovery by second-tier entities contracting with nonsubcontractors and by all entities beyond the second-tier. Global and Superior seek to undermine the latter restriction by relying on *Rich's* functional approach to collapse a putative general contractor and a putative first-tier subcontractor into a single entity. But the Supreme Court's application of a functional test to determine whether one entity was a subcontractor of another rather than a mere supplier certainly doesn't compel a similar approach to the question whether two distinct corporations should be treated as a unitary "contractor" under the Miller Act. *See United States ex rel. Gold Bond Bldg. Prods. v. Blake Constr. Co.,* 820 F.2d 139, 142 (5th Cir.1987). In fact, neither *MacEvoy, Rich,* nor *Bateson* resolves the question with which we are now presented. Considerations of

sound policy coupled with the general tenor of prior judicial decisions, however, lead us to reject appellants' contentions.

In the context of the Miller Act, the Supreme Court has repeatedly warned that the "salutary policy [of liberal construction of remedial statutes] does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds." *Bateson,* 434 U.S. at 594, 98 S.Ct. at 878 (quoting *MacEvoy,* 322 U.S. at 107, 64 S.Ct. at 893). That warning is apt here. The statute in question identifies the (prime) "contractor" as the person awarded the contract with the government, 40 U.S.C. § 270a(a), or the person posting the payment bond, 40 U.S.C. § 270b(a); it leaves little room for interpretation. Unless Builders can be collapsed into WNH or otherwise considered the legal "person" awarded the government contract or posting the payment bond, it can't be classified a prime contractor.

We think that's appropriate only where ordinary principles of corporate law permit the courts to disregard corporate forms. The aging pre–*Bateson* cases on which Global and Superior rely, *Glens Falls Ins. Co. v. Newton Lumber and Mfg. Co.,* 388 F.2d 66 (10th Cir.1967), *cert. denied,* 390 U.S. 905, 88 S.Ct. 821, 19 L.Ed.2d 873 (1968); *Continental Casualty Co. v. United States ex rel. Conroe Creosoting Co.,* 308 F.2d 846 (5th Cir.1962); *Fine v. Travelers Indemnity Co.,* 233 F.Supp. 672 (W.D.Mo.1964), arguably applied a more lenient standard, but each understandably fails to address the Supreme Court's more recent admonition in *Bateson* to heed the Miller Act's terms and avoid imposing "wholesale liability" on payment bonds. 434 U.S. at 594, 98 S.Ct. at 878. The statute by its terms limits recovery to those having direct contractual relationships with subcontractors who in turn have direct contractual relationships with the "contractor furnishing [the] payment bond," 40 U.S.C. § 270b(a), and we must enforce that limitation. In rigorously applying it, we follow other courts which have recognized that "in [the Miller Act's] risk-allocation scheme certainty is essential." *Gold Bond,* 820 F.2d at 142; *see United States ex rel. K & M Corp. v. A & M Gregos, Inc.,* 607 F.2d 44 (3d

Cir.1979); *see also Bateson,* 434 U.S. at 593, 98 S.Ct. at 877 (noting "the importance of certainty with regard to bonding practices on Government construction projects"). While the possibility that general contractors will weave elaborate webs of do-nothing subcontractors between themselves and the ranks of legitimate subcontractors in order to deprive them of Miller Act coverage cannot be discounted altogether, it must be balanced against the uncertain allocation of risks that might result from a more open-ended inquiry and the ability of professional parties to provide contractually their own insurance against defaults. Parties contracting with others who can either produce a contract with the government or produce a contract with a subcontractor who can in turn produce a government contract will have the assurance of a Miller Act remedy. All other parties will have the assurance of its lack, and the incentive to order their affairs accordingly.

### C

■ Having established the rule to be applied where a party seeks to collapse two entities into a single prime contractor under the Miller Act, we now apply it.[5] Corporate forms exist to limit liability, and courts are reluctant to set them aside simply because they've done so. Decisions to "pierce the corporate veil" turn on a case-by-case factual inquiry in which the presence of the following factors suggests with varied force the appropriateness of disregarding the corporate forms distinguishing two business entities:

gross undercapitalization of the subservient corporation, failure to observe corporate formalities, nonpayment of dividends, siphoning of the subservient corporation's funds, nonfunctioning officers and directors, a lack of corporate records, and the fact that the corporation is merely a facade for the operation of the dominant stockholder or stockholders. *Keffer v. H.K. Porter Co.,* 872 F.2d 60, 65 (4th Cir.1989).

The general absence of these factors here suggests that disregarding corporate forms would be inappropriate. Global and Superior presented no evidence that Builders was undercapitalized, lacked corporate records separate from WNH's, or was a victim of siphoning by WNH. They argue, in essence, that both WNH and Builders are mere facades for Harkins and Cooke, occasionally suggesting in addition that corporate forms haven't been observed and that WNH's and Builder's officers and directors really have no role. We disagree.

The record shows that Builders is a fully functional general contractor operating independently of WNH. The fact that Harkins Inc. was marketing the collective expertise of the Harkins Group when it bid on the contract doesn't render WNH and Builders the same corporation. Harkins and Cooke installed WNH rather than Builders as the government contractor for a variety of sound business reasons, not simply to deprive remote subcontractors of a statutory remedy. WNH was a single-project development partnership whose role was to acquire the prop-

---

5. It's not clear whether federal or state corporate law supplies the rule governing our decision whether to disregard the corporate forms distinguishing WNH from Builders, *compare Kamen v. Kemper Fin. Servs., Inc.,* —— U.S. ——, ——, 111 S.Ct. 1711, 1717–18, 114 L.Ed.2d 152 (1991) (requiring incorporation of state law concerning shareholder demand requirement as rule of decision in private action under federal securities laws because parties expect their corporate affairs to be governed by state law and because incorporating the state rule wouldn't impair the federal remedy or contravene the statute), *with United States ex rel. Woodington Elec. Co. v. United Pac. Ins. Co.,* 545 F.2d 1381, 1382 (4th Cir. 1976) (applying federal law to determine whether two parties are contractor-subcontractor or joint venturers in Miller Act action) (citing *Rich,* 417 U.S. at 127–28, 94 S.Ct. at 2164). Since

appellants rested their hopes on the contention that the standard for collapsing two corporations under the Miller Act was "not nearly so stringent" as the test for piercing the corporate veil, Appellants' Brief at 35, and appellees contended that a "sham" rule was inappropriate under any circumstances and its application unwarranted here regardless, neither party found it necessary to address the conflicts question we've identified. Finding the substantive result unambiguous under any of the conceivably applicable tests for disregarding corporate form, we decline to take up this unargued question here. *See Keffer v. H.K. Porter Co.,* 872 F.2d 60, 65 (4th Cir.1989); *Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 603 A.2d 1301, 1317–19 (1992); *Beale v. Kappa Alpha Order,* 192 Va. 382, 64 S.E.2d 789, 797–98 (1951).

erty, build the project, and lease it to the government for twenty years. Its limited partnership form provided well known tax advantages not available to a corporation like Builders. Builders, by contrast, was a general contractor of long standing with a number of other clients whose role was to perform the actual construction. Separating the two entities kept WNH's mortgage creditors out of Builders's coffers and Builders's other construction creditors away from WNH's funds.

The evidence doesn't support the intimation by Global and Superior that WNH and Builders failed to observe corporate forms. Their relations were governed by a valid and enforceable contract. WNH breached its contractual obligation to the government by inadvertently omitting certain provisions in that contract, but this doesn't make WNH and Builders the same corporation. Nor does the fact that WNH's standard form contract with Builders refers to the former as the project "owner" and the latter as the "contractor."

The claim that WNH and Builders had nonfunctional officers is likewise unsustainable. Harkins and Cooke controlled both corporations and served as their chief officers, so it's unsurprising that they resolved disputes between them. Richard Lombardo, Vice President of Harbor Land Company, WNH's general partner, administered the project for WNH. James Tobin, a Vice President of Builders, ran the job for that corporation. The fact that Harkins and Cooke resolved disputes between the two corporations doesn't change that; they were, after all, the chief officers of WNH's general partner and of Builders.

Global and Superior rely heavily on this commonality of ownership and control between WNH and Builders, but that without more doesn't justify setting aside corporate forms, and nothing more exists. Global and Superior point to a host of facts alleged to be material, but they've failed to establish that any party had difficulty determining whether it was dealing with WNH or Builders. Under the circumstances, disregarding corporate forms would be inappropriate.

## IV

Viewing the parties' contentions in the light most favorable to the nonmovants Global and Superior, it's nonetheless apparent that application of our construction of the Miller Act to the facts presented here leaves Global and Superior in the position identified as theirs by the district court—third-tier subcontractors for whom WNH's Miller Act payment bond was beyond reach. We therefore affirm that court's challenged orders granting summary judgment for Harkins Inc., WNH, Builders, and Federal on the Miller Act claims brought by Global and Superior and denying summary judgment for Global on the same.

*SO ORDERED.*