DISTRICT CONTRACTORS, INC., Plaintiff,

v.

NORTH AMERICAN SPECIALTY INSURANCE COMPANY, Defendant.

No. CIV.A.03–263 RMC.

United States District Court, District of Columbia.

Sept. 8, 2003.

Michael F. Callahan, Thyden, Gross & Callahan, Chevy Chase, MD, for Plaintiff.

Cynthia E. Rodgers–Waire, Whiteford, Taylor & Preston, Baltimore, MD, for Defendant.

### MEMORANDUM OPINION

COLLYER, District Judge.

District Contractors, Inc. ("District") has sued North American Specialty Insurance Company ("NAS") as surety for two construction projects on which District alleges that it performed work but was not fully paid. NAS has filed a motion to dismiss or, in the alternative, for summary judgment. Finding that District has no claim under one of the surety bonds, but that it might have a valid claim under the other, the Court will grant the motion as a motion for summary judgment in part and deny it in part.

### Background Facts

This dispute had its origin when Union Dismantling & Salvage, Inc. ("Union") and NAS agreed that NAS, as surety, would provide performance and payment bonds for the excavation and demolition work

Union performed in the Washington, D.C., area.[1] To protect NAS, that company obtained an indemnity agreement from Horace G. Baldwin, James R. Passero and Edna Rose Passero, the individuals behind Union. The Union Indemnity Agreement was signed on May 11, 2001. NAS entered into a similar arrangement in November 2001 with Prince Construction Company, Inc. ("Prince"), and its principals, Alberto Gomez and Maria Cristina Gomez.

Prince and Union then agreed to form Prince Construction Co., Inc./Union Dismantling & Salvage, Inc., A Joint Venture ("Joint Venture"). On or about October 19, 2001, the Joint Venture, as contractor, agreed with J.A. Jones/Tompkins Builders, Inc., as owner/obligee, to provide excavation services for a project commonly referred to as the Gallery Place Excavation Package, 707 7th Street, N.W., Washington, D.C. ("Gallery Place Project"). NAS issued performance and payment bonds, both bearing Bond No. 189425 ("Gallery Place Bonds"), and both in the penal sum of $2,220,000, to secure the Joint Venture's performance of the Gallery Place Project contract.

Thereafter, in January 2002, Union, as contractor, agreed with Kadcon Corporation ("Kadcon"), as owner/obligee, to perform demolition, excavation, and other services at the Eagle Building, 3333 M Street, N.W., Washington, D.C. ("M Street Project"). NAS again issued performance and payment bonds to Kadcon, both bearing Bond No. 192502 ("M Street Bonds"), in the penal sum of $819,400, to secure Union's performance on the project.

Circumstances for Union apparently went from bad to worse and on March 20,

2002, it filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland. The case was converted to a Chapter 7 liquidation on or about June 17, 2002. After the conversion to a Chapter 7 case, Union ceased all work on the M Street Project.

In July 2002, the bankruptcy court granted a motion by Union's chapter 7 bankruptcy trustee to reject the contract between Union and Kadcon for the M Street Project. Kadcon then called upon NAS to fulfill its obligations as surety. Kadcon and NAS entered into a takeover agreement ("Takeover Agreement") on July 15, 2002, by which NAS substituted itself for Union on the original contract between Union and Kadcon and Kadcon agreed to permit NAS to enter into a subcontract with Construction Management, Inc. ("CMI") to perform the remaining work on Union's contract with Kadcon. CMI then entered into a subcontract with Prince to perform work on the M Street Project and Prince, in turn, subcontracted with District to perform a portion of the work on the M Street Project. Because the work on the Gallery Place Project was performed by the Joint Venture, it was not affected by Union's bankruptcy. District asserts that it also performed work on the Gallery Place Project, sending its bills directly to the Joint Venture. When the parties briefed this case in the spring of 2003, work on both projects was on-going.

District now seeks damages in excess of $250,000, plus interest, costs, and attorneys' fees from NAS against the M Street Payment Bond. It also seeks damages of $52,338.12 plus interest, costs, and attorneys' fees from NAS against the Gallery

1. There is no dispute between the parties as to the basic facts, which are taken in part from the complaint and in part from NAS's briefs and attached documents. The Court thanks counsel for both sides for their clear and succinct presentations of the facts and arguments.

Place Payment Bond. It is to be noted that District's owners and officers, James R. Passero and George Carr, are former owners/officers/employees of Union.

## Relevant Terms of the Bonds and Contracts

The M Street Payment Bond defines a "Claimant" as "an individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract." Motion to Dismiss or, in the Alternative, for Summary Judgment, Exh. 1 at ¶ 15.1. The "Contractor" at issue was Union. Under the Bond, NAS is obligated to "pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference." *Id.*, Exh. 1 at ¶ 1.

When NAS and Kadcon agreed to the Takeover Agreement, NAS agreed to take over performance of Union's work and stepped into the shoes of Union. The Takeover Agreement states, "The term 'Contractor' as used in the Original Contract shall be deemed, after the date of this Agreement, to refer to the Surety [NAS] rather than to the Former Contractor [Union]." *I* d., Exh. 2 at ¶ 1. In addition, the Takeover Agreement specified that the M Street Payment Bond "shall remain in full force and effect in accordance with its terms and conditions." *Id.*, Exh. 2 at ¶ 10. And, by way of the Takeover Agreement, Kadcon agreed that CMI would perform the remaining work as a subcontractor to NAS.

The Gallery Place Payment Bond is similar. It defines a claimant as "one having a direct contract with the Subcontractor for labor or material, or both, used or reasonably required for use in the performance of the Subcontract ...." *Id.*, Exh. 4 at ¶ 1. The Subcontractor is identified as the Joint Venture.

Neither the M Street Payment Bond nor the Gallery Place Payment Bond provides for attorneys' fees to a claimant.

The subcontract between Prince and District for the M Street Project is also in the record. *Id.*, Exh. 3 ("M Street Subcontract"). Executed on July 17, 2002, it identifies Prince as the "Contractor" and District as the "Subcontractor." However, it describes the work to be performed as "Per CMI Contract Terms and Conditions" and states that payments from Prince to District shall be made "Next Day after payment is received from CMI." *See* M Street Subcontract, Articles 2, 5. Clause 11.12.1 of the M Street Subcontract allows the Subcontractor to cease work after seven days' notice to the Contractor if the Contractor fails to pay the Subcontractor as contemplated. Clause 13 provides for binding arbitration in the event of any dispute between Subcontractor and Contractor.

## Standard of Review

NAS has filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. NAS has attached documents outside of the pleading to its memoranda, on which the Court relies in deciding the motion. The Court therefore treats the motion as one for summary judgment. *See* FED. R. CIV. P. 12(b). Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not a "disfavored legal shortcut[;]" rather, it is a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining

whether a genuine issue of material fact exists, the court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Any factual dispute must be capable of affecting the substantive outcome of the case to be "material" and "genuine." *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987).

## Analysis

The question is whether District qualifies as a claimant under either of the payment bonds. NAS argues that it clearly does not qualify and that the suit should be dismissed.

### A. *M Street Payment Bond*

■ Count One of the complaint concerns the M Street Project. It alleges that District had a subcontract with Prince at the M Street Project; that Prince had a subcontract with CMI; and that CMI had a contract with NAS. These complaint allegations are accurate and all of the relevant contracts are in the record. Since District does not claim to have ever had a direct contract with Union or with any subcontractor of Union, it cannot be a "claimant" by that route. Under the Takeover Agreement, NAS took over Union's obligations, NAS contracted with CMI, CMI contracted with Prince, and Prince contracted with District. Since District did not have a direct contract with NAS or a subcontract with CMI (the subcontractor to NAS), it cannot be a claimant by that route either.

■ District argues against this conclusion. It asserts that CMI "is acting as the agent for NAS." Memorandum of Points and Authorities in Opposition to Motion to Dismiss (("Opposition") at 3). "If NAS'[s] theory is adopted, then in each and every event where a Surety completed the work under the requirements of its Performance Bond ..., then a new tier would be created altering the protection of the original payment bond." *Id.* Because the Takeover Agreement did not change the terms of the original payment bond, and because Prince is the "Contractor" on District's contract for the M Street Project, not CMI, District argues that it should be protected by the M Street Payment Bond. District also cites *U.S. ex rel. M.A. Bruder & Sons, Inc. v. Aetna Casualty & Surety. Co.,* 480 F.Supp. 659 (D.D.C.1979) and *Glens Falls Insurance Co. v. Newton Lumber & Manufacturing. Co.,* 388 F.2d 66 (10th Cir.1967),[2] by analogy to the Miller Act and the proposition that the Court should examine the nature of the relationship between NAS and CMI to "[e]nsure that the structure is not a 'sham' or 'straw man.'" Opposition at 3.

The Court finds that the terms of the M Street Payment Bond are clear and unambiguous and must be applied as written. *J.W. Bateson Co., Inc. v. U.S. ex rel. Bd. of Trustees,* 434 U.S. 586, 594, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978) (The "salutary policy [of liberal construction of remedial statutes] does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds.") (quotation omitted). The M Street Payment Bond covers three levels of performance contractors: Union/NAS; direct contractors to Union/NAS, *i.e.,* CMI; and subcontractors to the direct contractors to Union/NAS, *i.e.,*

**2.** In its Opposition, District cites *Glens Falls* as the case name, but provides the citation, 233 F.Supp. 672 (W.D.Mo.1964), of another case, *Fine v. Travelers Indemnity Co.* Consideration of *Fine* does not change the Court's decision.

Prince. District, by its own description, is not within those relationships because it is a subcontractor to Prince. The cases cited by District do not change this result. In both *Glens Falls* and *U.S. ex rel M.A. Bruder*, the evidence showed that a contractor intentionally placed a sham company that performed no work between the contractor and the subcontractor in order to avoid responsibility under a performance bond. There is no evidence here to support the insinuation from District that the relationship between NAS and CMI is a "sham." NAS is in the business of providing insurance and bonding services; it is not a construction manager or general contractor, as is CMI. There is nothing untoward in NAS retaining CMI to perform these services on projects abandoned by Union. The uncontroverted evidence shows that NAS and CMI are separate and unrelated entities that are not legally related and share no common personnel. NAS is a New Hampshire corporation and CMI is a Connecticut limited liability company. One is in insurance while the other is in construction. District has presented no evidence of any sham transaction or facts that would warrant piercing the corporate veil between NAS and CMI.

Another factor distinguishes this case from those cited by District. District's owners and officers are former owners/officers/employees of Union. Mr. Passero is a signatory on the Union Indemnity Agreement and presumably played some role in negotiating the surety arrangements on Union's behalf with NAS; at a minimum, he was certainly fully familiar with those documents and the reasons why NAS retained CMI to complete the project. There is some irony in the situation:

NAS has been required to pay to complete Union's work, including a $60,000 penalty to Kadcon for delay, and now former officials of Union want NAS to pay them for work that Union should have performed. This is not a story of a sham or innocent workmen deceived. *See United States ex rel. Global Building Supply, Inc. v. WNH Ltd. P'ship*, 995 F.2d 515, 521 (4th Cir. 1993).

One final point: the subcontract between Prince and District details the two vehicles available to District if it believes that Prince owes it money. District can, with seven days notice, cease work until paid and/or it can arbitrate the dispute. What District cannot do is ignore the clear terms of the M Street Payment Bond and become a "claimant" under that bond. Count One of the complaint will be dismissed.[3]

## B. *Gallery Place Payment Bond*

Under Count Two of the complaint, District also seeks to recover under the Gallery Place Payment Bond. To do so, it must qualify as "having a direct contract" with the Joint Venture "for labor or material, or both, used or reasonably required" on the Project. NAS attacks the complaint for failing to allege such a "direct contract" and therefore argues that the Court should grant NAS summary judgment on this count. District argues that the complaint, in paragraphs 20 and 21, adequately pleads that District provided work and services, that the services were accepted by the Joint Venture, and that invoices were sent to the Joint Venture. It suggests that the Court should allow for

---

**3.** Since District is not a "claimant" under the M Street Payment Bond, none of its claims against that bond have merit. The Court finds, in addition, that the M Street Payment Bond would not, in any event, provide recovery for breach of contract damages or attorneys' fees. District effectively conceded as much, in that it failed to pursue these claims in its Opposition.

amendment of the complaint if it is deemed ambiguous.

Parties can have a "direct contract" that is not in writing, although it would appear from the M Street Subcontract that it was the practice of Prince and District to execute a written agreement. Whether these parties had a direct contract for the Gallery Place Project cannot be determined on this record. District will be given 30 days to amend its complaint to clarify this ambiguity prior to requiring an answer from NAS. The court will grant NAS summary judgment on the claim for attorneys' fees under the Gallery Place Payment Bond as the bond does not allow such a recovery.[4]

## Conclusion

For the reasons stated, the Court grants the motion to dismiss in part and denies it in part. The Court grants the motion for summary judgment as to Count One because District does not qualify as a "claimant" under the M Street Payment Bond. Count Two of the complaint is dismissed in part only. The Court grants NAS's motion for summary judgment with respect to the claim in Count Two for attorneys' fees under the Gallery Place Payment Bond. District is given 30 days to amend this count to clarify its ambiguity as to the nature of the alleged direct contract between District and Prince on the Gallery Place Project before NAS will be required to answer. A separate Order accompanies this Memorandum Opinion.

4. It is noteworthy that District did not respond to this argument at all in its Opposition.