FILED
United States Court of Appeals
Tenth Circuit

February 7, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

THE UNITED STATES OF AMERICA
(FOR THE USE AND BENEFIT OF
O.L.S., INC., d/b/a OZARK LASER
AND SHORING),

      Plaintiff-Appellant,

v.

SOUTHWIND CONSTRUCTION
SERVICES, LLC, an Oklahoma
corporation; SOUTHWIND
CONSTRUCTION COMPANY, INC.,
an Oklahoma corporation; FIDELITY &
DEPOSIT COMPANY OF
MARYLAND, a Maryland corporation,

      Defendants-Appellees.

No. 12-6132
(D.C. No. 5:11-CV-00195-R)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **ANDERSON** and **BALDOCK**, Circuit Judges, and **BRORBY**, Senior Circuit
Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

O.L.S., Inc. ("Ozark") was a third-tier subcontractor on a federal construction project at Tinker Air Force Base in Oklahoma. When it did not get paid for the equipment it leased to a second-tier subcontractor, Ozark brought an action on the payment bond against the first-tier subcontractor, the prime contractor, and the surety under the Miller Act, 40 U.S.C. §§ 3131, 3133.[1] The district court dismissed the suit for lack of jurisdiction, concluding that because Ozark was a third-tier subcontractor, it was not protected by the bond and could not sue under the Miller Act. Ozark appeals, arguing that the prime contractor and the first-tier subcontractor should be treated as a single, unitary prime contractor, thereby eliminating a tier of the contractual structure and making Ozark a second-tier subcontractor entitled to protection under the bond.

In 2005, Southwind Construction Company, Inc. ("Southwind") received a multi-year Indefinite Duration, Indefinite Quantity contract from the government known as a SABER contract. Over the course of five years, the government issued multiple delivery orders to Southwind for maintenance, repair, and construction services at Tinker Air Force Base. At issue here is an order issued to Southwind in September 2009 to perform a project known as "Repair RAC FirePond" ("RAC Project"). In connection with this project, Southwind, as principal, and Fidelity & Deposit Company of Maryland ("Fidelity"), as surety, executed a payment bond.

---

[1]    As required by the Miller Act, the suit was brought in the name of the United States for the benefit and use of Ozark. *See* 40 U.S.C. § 3133(b)(3)(A).

Southwind subcontracted the majority of the work on the RAC Project to Southwind Construction Services, LLC ("Services"), which then subcontracted part of that work to Johnson & Johnson Utility ("Johnson"). Johnson later entered into a contract with Ozark to lease equipment. The RAC Project had significant cost-overruns, and Johnson failed to pay Ozark $22,288.21. Ozark seeks to recover that amount from Southwind's payment bond.

The Miller Act requires every contractor who is awarded a government construction contract of $100,000 or more to furnish a payment bond "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person." *Id.* § 3131(b)(2). The Act defines a "contractor" as "a person awarded a contract . . . for the construction, alteration, or repair of any public building or public work of the Federal Government." *Id.* § 3131(a), (b). The Act further provides that a person who provides labor or material to the contractor may bring an action on the payment bond, *id.* § 3133(b)(1), as can "[a] person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond," *id.* § 3133(b)(2).

Although the Miller Act defines the term "contractor," it does not define the term "subcontractor." The Supreme Court has held that Congress intended to give the term its "technical meaning, as established by usage in the building trades." *Clifford F. MacEvoy Co. v. U.S. ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 108-109

- 3 -

(1944). Accordingly, a "subcontractor" is "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." *Id.* at 109. "[A] contract with the prime contractor is a prerequisite to being a 'subcontractor.'" *J.W. Bateson Co. v. U.S. ex rel. Bd. of Trs. of Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 590 (1978).

Looking at the contractual scheme here, Southwind, as the company that had the contract with the government and posted the payment bond, was the prime contractor. Services, as a company who had a contract with Southwind to take from Southwind a part of the labor or material requirements of Southwind's contract with the government, was a subcontractor (or first-tier subcontractor). And Johnson, which had a direct contract with Services but no contract with Southwind, was a sub-subcontractor (or second-tier subcontractor) entitled to make a claim against the payment bond. *See* 40 U.S.C. § 3133(b)(2). Ozark, which had no contract with either Southwind or Services, was a third-tier subcontractor and had no right to make a claim against the bond. *See Bateson*, 434 U.S. at 591-92.

Ozark argues, however, that the court should look at the substance, rather than the form, of the parties' respective contractual relationships and recognize that although Services was nominally a subcontractor, in reality, it was the de facto prime contractor. Accordingly, Ozark argues, the court should treat Southwind and Services as a unitary prime contractor and Johnson as a first-tier subcontractor, which would make Ozark a second-tier subcontractor entitled to protection under the Miller

Act.  Ozark relies on this court's decision in *Glens Falls Insurance Co. v. Newton Lumber & Manufacturing Co.*, 388 F.2d 66 (10th Cir. 1967), as authority for disregarding the parties' formal contractual relationships.

In *Glens Falls*, two third-tier subcontractors sought the protection of the prime contractor's payment bond by arguing that the nominal first-tier subcontractor, Campbell, was a sham and that the nominal second-tier subcontractor, Whiteside, was the true first-tier subcontractor.  Following a bench trial, the district court found that Campbell was a sham; that he permitted DMH, the prime contractor, to use his name in the contract with Whiteside in order to protect DMH; that DMH did not intend to impose any contractual obligation on Campbell despite its contract with him; that the purpose of executing a contract between DMH and Campbell and then a contract between Campbell and Whiteside was to insulate DMH from liability to Whiteside's materialmen by making Campbell appear to be the subcontractor; and that Campbell's true relationship with DMH was that of employee or agent.  *Id.* at 69.

On appeal, this court concluded that the district court "properly regarded substance, rather than form," in concluding that Whiteside was the true first-tier subcontractor, because "[o]therwise, the purpose of the remedial statute, to protect suppliers of materials to the actual subcontractors of the prime contractor, could be defeated by setting up by formal contract a straw man as a subcontractor between the prime contractor and one who in substance and intent is the actual subcontractor."

- 5 -

*Id.* at 69-70. We therefore affirmed the district court's judgments against DMH and its surety in favor of the plaintiffs who supplied materials to Whiteside.

Ozark argues that we should take a similar "substance over form" approach here. But there are several impediments to doing so. First, it is not clear that this court's focus on "substance and intent" to determine "the actual subcontractor," *id*. at 70, is still proper after the Supreme Court's decision in *Bateson*. The Court in *Bateson* acknowledged that, in earlier cases, it had taken a functional approach to determining who is a subcontractor for purposes of the Miller Act. 434 U.S. at 593-94. But it explained that in those previous cases, notably, *MacEvoy* and *F.D. Rich Co. v. U.S. ex rel. Industrial Lumber Co.*, 417 U.S. 116 (1974), the party in question had a "direct contractual relationship with the prime contractor" and the question before the Court was whether that party qualified as a "subcontractor" or was merely a supplier. *Bateson*, 434 U.S. at 594. By contrast, in *Bateson*, where the employees of a second-tier subcontractor sought to make a claim on the bond, the Court said that a functional approach was improper because "the traditional tools of statutory construction provide a definitive answer to the question before us." *Id.* at 594.

The Court held that "the word 'subcontractor' must be limited in meaning to one who contracts with a prime contractor." *Id.* And although the second-tier subcontractor did have a direct contractual relationship with the first-tier subcontractor, the second-tier subcontractor's employees did not and were therefore not entitled to make a claim against the bond. *Id.* at 591-92. "Congress . . . intended

- 6 -

the scope of protection of a payment bond to extend no further than to sub-subcontractors." *Id.* at 591. The Court was "not unmindful of [its] obligation to construe the highly remedial Miller Act liberal[ly] . . . in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *Id.* at 594 (second & third alterations in original) (internal quotation marks omitted). But "such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds." *Id.* (internal quotation marks omitted). The Court recognized the "importance of certainty with regard to bonding practices on Government construction projects." *Id.* at 592.

Following *Bateson*, it is not clear that anyone who does not have a direct contractual relationship with either the prime contractor or a first-tier subcontractor could legitimately make a claim against the payment bond, regardless of the actual functions carried out by the respective parties. *See U.S. ex rel. K & M Corp. v. A & M Gregos, Inc.*, 607 F.2d 44, 47 (3d Cir. 1979) ("We agree that *Bateson* rules out a holding that the court may look to the functions carried out by contracting parties, rather than to the position they occupy in the contractual structure, to identify the first-tier subcontractor."). But even if it may still be possible after *Bateson* to establish that a nominal first-tier subcontractor was merely a sham or alter ego of the prime contractor so that the second-tier subcontractor's contract with the nominal first-tier subcontractor could be said, in reality, to have been with the prime contractor, such a theory would not benefit Ozark.

First and foremost, Ozark does not seek to show that Services was a sham subcontractor, so that Johnson's subcontract should be deemed to have been directly with Southwind. Ozark concedes that Services actually performed for and took from Southwind a specific part of the labor or material requirements of Southwind's contract with the government. *See MacEvoy*, 322 U.S. at 109 (defining who is a "subcontractor"). In fact, Ozark's complaint is that Services took on and performed *too many* of Southwind's obligations and thus functioned more like a prime contractor than a subcontractor. But the Miller Act quite clearly defines the prime contractor as the person who is awarded the contract with the government and who posts the surety bond. 40 U.S.C. § 3131 (a), (b). And Ozark does not dispute that Southwind is the only party to the SABER contract with the government[2] and that Southwind is the only party to the bond agreement with Fidelity.

The Fourth Circuit has held that it may be possible to treat the prime contractor and its subcontractor as a unitary prime contractor for the purposes of the Miller Act, but "only where ordinary principles of corporate law permit the courts to disregard corporate forms." *U.S. ex rel. Global Bldg. Supply, Inc. v. WNH Ltd. P'ship*, 995 F.2d 515, 519 (4th Cir. 1993). The district court here held that, under Oklahoma law,

> to disregard the separate corporate existence of an entity, a party must
> show either 1) that the separate corporate existence of that entity is a

---

[2]   In fact, Services was not formed until 2007, well after Southwind entered into the SABER contract and performed substantial work under it.

design or scheme to perpetrate a fraud, defeat public convenience, justify a wrong or defend a crime; *or* 2) that one corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of another corporation, a dummy or a sham.

Aplt. App., Vol. 3, at 935. It concluded that Ozark failed to establish a basis for disregarding the separate corporate existence of Southwind or Services, or even to create a genuine issue of fact on the matter.

Ozark does not disagree with the district court's statement of Oklahoma law or its conclusion that Ozark failed to meet this legal standard. Ozark argues only that it did not have to meet this standard, because, according to *Glens Falls*, it had only to show that Southwind and Services "act[ed] interchangeably" and that "[t]he substance of the parties['] conduct was that of a unitary contractor rather than a prime contractor and a subcontractor." Aplt. Br. at 21. But as we have already explained, the plain language of the Miller Act does not permit us to use a functional approach to determine the identity of the prime contractor, because the Act itself defines who is a prime contractor.[3]

---

[3] Because Ozark does not dispute the district court's conclusion that the evidence did not establish grounds for piercing the corporate veil, we need not decide whether the existence of such grounds would ever permit a court to treat a nominal second-tier subcontractor as a first-tier subcontractor or to treat a nominal first-tier subcontractor as a prime contractor under the Miller Act. *Cf. A & M Gregos*, 607 F.2d at 48 (declining to decide "whether *Bateson* ever permits an application of a sham rule or whether in the case of a truly illusory subcontractor this circuit should apply a sham rule" in light of its conclusion that contract between prime contractor and first-tier subcontractor was bona fide).

Finally, treating Services as the prime contractor in order to elevate Ozark from its position as a third-tier subcontractor to that of a second-tier contractor would not benefit Ozark, because Services--regardless of the role it may have played--is not a party to the bond agreement with Fidelity. Fidelity's obligations on the bond extend only to the failure of *Southwind* to "promptly make[] payments." Aplt. App. at 103. The court cannot unilaterally alter the terms of the bond agreement to extend Fidelity's obligations to *Services*. *See* 15 Okla. Stat. § 373 ("A surety cannot be held beyond the express terms of its contract . . . ."). So treating Services as the de facto prime contractor would not permit Ozark to make a claim against the payment bond.

As a third-tier subcontractor, Ozark is simply in too remote a relationship to Southwind to be protected by the payment bond. "It was Congress that drew a line between sub-subcontractors and those in more remote relationships to the prime contractor. If the scope of protection afforded by the Miller Act payment bond is to be extended, it is Congress that must make the change." *Bateson*, 434 U.S. at 594 (citations omitted) (internal quotation marks omitted).

The judgment of the district court is affirmed.

Entered for the Court

Wade Brorby
Senior Circuit Judge

- 10 -